LAK, INC., Plaintiff–Appellee,

v.

DEER CREEK ENTERPRISES, Defendant–Appellant.

No. 87–1321.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 10, 1987.

Decided Sept. 20, 1989.

Rehearing and Rehearing En Banc Denied Nov. 2, 1989.

Jeffrey G. Heuer, Jaffe, Snider, Raitt & Heuer, Brian G. Shannon, Detroit, Mich., Joel S. Perwin (argued), Miami, Fla., for defendant-appellant.

Gordon S. Gold, Evans & Luptak, D. Michael Kratchman (argued), Detroit, Mich., for plaintiff-appellee.

Before NELSON and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This is an appeal from a judgment entered by a federal district court in Michigan in an action against an Indiana partnership on a contract for the sale of a valuable tract of land in Florida. The plaintiff is a Michigan corporation, and the federal courts have subject matter jurisdiction under 28 U.S.C. § 1332. The defendant partnership was never present in Michigan, however, it never consented to be sued there, and it has insisted from the outset of the litigation that it never invoked the benefits and protections of Michigan's laws by purposefully availing itself of the privilege of transacting business in that state. The first question we must address, therefore—a question that is dispositive of the appeal, as it turns out—is whether the facts established by the plaintiff corporation justified the district court's exercising jurisdiction over the person of the defendant partnership.

The district court concluded (a) that the case came within the terms of Michigan Comp. Laws § 600.725 (the section of Michigan's long-arm statute dealing with "limited" personal jurisdiction over partnerships) and (b) that such personal jurisdiction could be exercised without violating the defendant's rights under the Due Process Clauses of the Fifth and Fourteenth Amendments. A timely motion to dismiss the complaint for want of *in personam* jurisdiction was denied, and the district court ultimately went on to enter a decree

of specific performance against the defendant.

We believe that the jurisdictional question was decided incorrectly, in light of the particular facts presented here, and we shall reverse the judgment for that reason.

I

The Supreme Court has rejected any resort to "talismanic jurisdictional formulas" for resolving questions of personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 485, 105 S.Ct. 2174, 2188, 85 L.Ed.2d 528 (1985). Instead, " 'the facts of each case must [always] be weighed' in determining whether personal jurisdiction would comport with 'fair play and substantial justice.' " *Id.* at 485–486, 105 S.Ct. at 2188–89, quoting *Kulko v. California Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978). We are therefore prompted to sketch out the facts of the present case in somewhat greater detail than might have been necessary had the case arisen at an earlier stage in the development of our jurisprudence.

Defendant Deer Creek Enterprises is an Indiana general partnership formed by two brothers, Mark and Hart Hasten. Both of the Hastens are residents of Indiana. Their Deer Creek partnership has its principal place of business in Indianapolis, Indiana. Deer Creek transacts no business in Michigan, according to an affidavit signed by Mark Hasten, nor has it ever transacted business in that state. Deer Creek has no real or personal property in Michigan, and there is no contention that it ever designated an agent to accept service of process there.

At the time with which we are concerned in this proceeding, Deer Creek had substantial real estate holdings in Florida. It owned, among other things, a 45–acre tract of land known as the "Cypress parcel." This particular parcel, which is located in a residential area between Boca Raton and Ft. Lauderdale, Florida, was unimproved by any buildings other than a small eight-unit apartment structure. The land had considerable potential for development, it appears.

Deer Creek did not advertise the Cypress parcel for sale, either in Michigan or elsewhere. In November of 1983, however, Deer Creek's Florida representative, Mr. Richard Jerman, received an unsolicited inquiry about a possible purchase of the parcel by Beznos Realty Investment Company, a Michigan limited partnership that was the predecessor in interest of plaintiff LAK, Inc. The property acquisition manager for Beznos Realty, Mr. Al Beke, met with Mr. Jerman in Florida on November 17, 1983. On the following day Mr. Jerman was given a letter of intent, signed by Mr. Beke on behalf of the Beznos organization, proposing to purchase part of the parcel.

Messrs. Beke and Jerman had several subsequent meetings in Florida, and they spoke over the telephone at times when Beke was in Michigan and Jerman in Florida. At no point did Mr. Jerman or any other representative of Deer Creek go into the State of Michigan on business related to this matter.

On two occasions in the latter part of December, 1983, Mr. Harold Beznos, one of the principals of Beznos Realty, met in Florida with the Hasten brothers, at the latters' invitation, to discuss the proposed purchase. Mr. Beznos met again with Mark Hasten in Florida on January 4, 1984, and an affidavit subsequently signed by Mr. Beznos says of this meeting that "we continued to negotiate the specifics of a real estate transaction...."

Mr. Beznos returned to his home in Michigan shortly after the January 4 negotiating session, and he had further discussions with Mark Hasten and other representatives of Deer Creek over the telephone.[1] In February of 1984—around the

---

1. A supplemental affidavit of Mr. Hasten says "we did not negotiate the substantive terms of the Purchase Agreement for the sale of the Cypress parcel in any of the telephone conversations. The substantive terms of the Purchase Agreement were all negotiated in Florida during face-to-face meetings with Harold Beznos." A responsive affidavit of Mr. Beznos says, and other evidence confirms, that certain warranties and other substantive terms of the deal were

time of yet another meeting between Messrs. Beznos and Hasten in Florida—Mr. Hasten instructed his lawyer in Indianapolis, Mr. Stephen Backer, to draw up a contract for the sale to Beznos Realty of the entire Cypress parcel.

On February 13, 1984, Attorney Backer dispatched a draft purchase agreement by Federal Express to Harold Beznos at the Biltmore Hotel in Phoenix, Arizona. It was subsequently learned that Mr. Beznos had left Phoenix, and on February 15 a second copy was sent to him at a hotel in Beverly Hills, California. (The record suggests that Mr. Beznos traveled extensively, and at various times he communicated with Deer Creek by telephone from Canada, Mexico, Texas, New York, Arizona and California, as well as from Michigan. Some of these calls evidently dealt with the third-party financing that was being arranged by Beznos, and others concerned matters having nothing to do with the Cypress parcel.)

Mr. Beznos gave the draft purchase agreement to his lawyer in Detroit, Mr. Michael Mehr, who promptly placed a telephone call to Attorney Backer in Indianapolis. The two lawyers had a number of conversations over the telephone in the latter part of February, and the agreement went through three additional drafts. Typed copies of these drafts were prepared in Mr. Backer's office in Indianapolis and were mailed to Mr. Mehr's office in Detroit. Unlike their principals, who had met several times in Florida, the lawyers never met face-to-face; all of their communications with one another were conducted by telephone or in writing.

Attorney Mehr's affidavit makes the point that "[n]o agreement to purchase and sell existed between the parties until the matters negotiated by me and Stephen Backer were expressed in the written Purchase Agreement." The affidavit of Mr. Beznos, similarly, says that "[n]o agreement to purchase the Deer Creek parcel existed until the matters set forth in the written Purchase Agreement were final-

ized." A revised copy of the purchase agreement was signed by Mr. Beznos in Michigan on February 29, 1984, and the document was then sent to Indiana for signature by Mr. Hasten. The purchase agreement was "finalized," in the sense that it became legally binding, only when Mr. Hasten signed it on behalf of Deer Creek. That signing occurred on March 2, 1984, in the State of Indiana.

The purchase agreement, which recited that Deer Creek was an Indiana general partnership, that Beznos Realty was a Michigan partnership, and that the land which formed the subject of the agreement was located in Florida, provided by its terms that the agreement was to be governed by the law of the *situs* state, Florida. (We pause here to note, parenthetically, that the agreement's Florida choice-of-law provision is by no means irrelevant to the question of personal jurisdiction. *Burger King*, 471 U.S. at 481, 105 S.Ct. at 2186. "Nothing in our cases," the Supreme Court has said, "suggests that a choice-of-law provision should be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws' for jurisdictional purposes." *Id.* at 482, 105 S.Ct. at 2187 (emphasis omitted). A showing that Deer Creek purposefully availed itself of the benefits and protections of Michigan law is essential to the plaintiff's jurisdictional claim, as we shall see, and this essential showing is not helped by the fact that the parties chose to have the contract governed by the law of Florida, rather than the law of Michigan. The parties having elected to invoke the benefits of Florida law for deciding disputes under the contract, there is obviously much to be said in favor of letting such disputes be resolved in a Florida court.)

The agreement specified a purchase price of $5,501,562.00, to be paid by cash or certified check at the time of closing. It also provided that upon acceptance of the agreement by Deer Creek, Beznos Realty would tender $275,078.10 as earnest mon-

negotiated by attorneys, rather than by the principals directly. Mr. Beznos also had telephone conversations from Michigan with Mr. Hasten about the purchaser's contractual obligation to secure financing from a third party.

ey. The latter sum, it was agreed, would be held until the closing in an account at a designated bank in Indianapolis. (The earnest money, in the form of a check drawn on a Michigan bank, was duly received by the Backer firm in Indiana and was deposited by it in the Indianapolis bank.) The closing was to be held with in 60 days, subject to a conditional right of extension for 30 days; the closing was to take place in the State of Florida.

Beznos Realty retained a right to terminate the agreement and recover the earnest money if it could not obtain a satisfactory loan commitment from the Atlanta and New York offices of Metropolitan Life Insurance Company. (An agreement negotiated by telephone on April 3, 1984, and agreed to by Mark Hasten in writing on May 5, provided for a 30-day extension of the closing date if a loan commitment were received from "any lender;" on April 26, 1984, Beznos Realty signed a loan commitment agreement with Lomas & Nettleton Financial Corporation, a mortgage banker with a regional office in Atlanta and headquarters in Texas.)

The purchase agreement did not require either Deer Creek or Beznos Realty to take any action in the State of Michigan. Neither did it provide for any significant continuing relationship of the sort that the seller's retention of a purchase money mortgage might have entailed, for example. The agreement did, however, give Beznos Realty an option to purchase golf club memberships in a facility in which Deer Creek had an interest. (The golf club was located near the Cypress parcel.) Exercise of this option would also give Beznos Realty a right to obtain social memberships in a nearby tennis club operated by Deer Creek. Under certain circumstances, the memberships in these Florida recreational facilities could be held open for as long as four years.

Deer Creek undertook to convey good, marketable and insurable title to the Cypress property, in fee simple, and obligated itself to provide, in addition to title insurance, a survey meeting the minimum standards of the Florida Board of Land Surveyors. A section of the agreement entitled "Seller Representations and Warranties" set forth a lengthy series of additional vendor's covenants. The first one that is significant here recited that "the Property is currently zoned to permit the construction of 532 units, *and 532 units shall be available to the property in accordance with an appropriate site plan,* as long as Purchaser complies with all appropriate laws and regulations governing the development of the Property." (Emphasis supplied.)

The language set out in italics was appended to the purchase agreement as a footnote. Testimony presented at trial established that the language of the footnote was proposed by Attorney Mehr, in Detroit, and accepted by Attorney Backer, in Indianapolis. Mr. Backer also accepted proposals for the addition of footnotes reciting that both a local improvement association and the municipality in which the property was situated (the City of Deerfield Beach, Florida) would approve site plans for 532 housing units. These provisions presumably reflected representations that Deer Creek had made to Beznos Realty directly, but we have not been able to ascertain whether any such representation was made to Beznos Realty in Michigan.

Shortly before the purchase agreement was finalized, according to Mr. Jerman's testimony, the City of Deerfield Beach agreed to an earlier request for allocation of a total of 508 housing units to the Cypress parcel. The zoning itself would have accommodated a substantially higher number, but a 540-unit site plan [2] that Beznos Realty's Mr. Beke submitted to Deerfield Beach on April 10, 1984, was rejected by the city because, in the city's words, "the proposed number of units exceeded the 508 unit cap...."

The parties disagree as to when and how the 508-unit cap was supposed to be raised, and they disagree as to whether Mr. Beke

---

**2.** The 540-unit plan contemplated the construction of 532 housing units in addition to the eight apartment units already in existence.

botched the job of persuading the city to raise it. (The district court's final judgment, which was entered on October 31, 1986, ordered defendant Deer Creek to obtain approval for the construction of 532 new units on pain of having the purchase price reduced by $10,188 per unit for each unit short of that number. Deer Creek promptly sought such approval, and later submitted evidence to the district court that on January 27, 1987, the Deerfield Beach City Commission decided to support construction of all of the additional units requested.)

No such decision by the city was forthcoming before the scheduled closing date, which had been extended to May 31, 1984, and the parties could not agree on how much of the purchase price ought to be paid over to Deer Creek at the time of closing. Mr. Beznos testified that he called Mr. Hasten and proposed putting approximately $300,000 of the agreed price in escrow until it was determined whether the total number of units permitted would be 540 or 508. Mr. Hasten rejected this proposal, according to the testimony, insisting that Beznos "take the property as is," with "no reduction of price period...." Hasten maintained that Beznos could get city approval for the additional units after the closing; Beznos was unwilling to pay the full price on the basis of such an assumption.

On May 1, 1984, Attorney Backer sent a letter to Beznos Realty's lawyers in Detroit confirming that "[t]he Hastens will not reduce the purchase price due to the Purchaser's inability to receive approval to construct 532 units on the Cypress Parcel." Beznos Realty then assigned its interest in the purchase agreement to LAK, Inc. Two weeks before the scheduled closing date, LAK filed the present lawsuit in the United States District Court for the Eastern District of Michigan.

In its complaint, LAK asserted that Mr. Backer's letter of May 1 constituted an anticipatory breach of the purchase agreement; the letter, LAK claimed, "repudiate[d] the representations, covenants, and warranties ... that an additional 532 units would be allowed to be erected on the property...." The complaint also alleged that the representations that the 532 units would be available were knowingly false when made. The complaint sought declaratory relief under Florida law, a decree of specific performance compelling transfer of the Cypress parcel at a price dependent on the number of units approved by the City of Deerfield Beach, Florida, and a judgment for money damages, including exemplary and punitive damages.

The plaintiff attempted to effect service on defendant Deer Creek by having a process server hand a summons and a copy of the complaint to Mark Hasten at the Deer Creek office in Indianapolis, Indiana.[3] Deer Creek promptly filed a motion to dismiss, contending that Deer Creek "lacks sufficient contact with the State of Michigan for this court to assert *in personam* jurisdiction over defendant consistent with the due process requirements of the United States Constitution." The district court denied the motion to dismiss, and the case eventually went to trial before a jury.

The jury returned a special verdict finding that there had been a material breach of contract and material misrepresentations by Deer Creek, but finding also that the plaintiff had suffered no damage as a result. The jury recommended an award of specific performance without an award of damages. The court accepted this recommendation and entered a decree in conformity with it. After extensive post-trial proceedings, in the course of which the court

---

**3.** Service beyond the territorial limits of Michigan could not be effective, under Rule 4(f), Fed.R.Civ.P., unless extraterritorial service was authorized by the law of the State of Michigan. See Rule 4(c)(2)(C)(i), Fed.R.Civ.P. The Michigan Court Rules that were in effect at the time of the purported service on Deer Creek said that there was no territorial limitation on the range of service upon a person having any of the relations with the state specified in the Michigan long-arm statute, see Mich.Gen.Ct.R. 1963, 105.9, but Michigan courts have routinely granted motions to quash extraterritorial service of process where personal jurisdiction is lacking. See, *e.g., Khalaf v. Bankers & Shippers Ins. Co.,* 62 Mich.App. 678, 233 N.W.2d 696, 697 (1975), *aff'd,* 404 Mich. 134, 273 N.W.2d 811 (1978).

filed a memorandum opinion adhering to its earlier ruling on the jurisdictional issue, the case was brought here by the filing of a timely notice of appeal.

## II

In a diversity action such as this, federal courts must look to the law of the forum state to determine the district court's "in personam jurisdictional reach." *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 376 n. 2 (6th Cir.1968.) *Cf. American Greetings Corp. v. Cohn,* 839 F.2d 1164, 1167 (6th Cir.1988). Plaintiff LAK chose neither Florida nor Indiana as its forum, of course, but opted instead for Michigan.

Michigan's long-arm statute authorizes the exercise of "general" personal jurisdiction over foreign partnerships on either of two grounds: consent, and "[t]he carrying on of a continuous and systematic part of [the partnership's] general business within the state." Mich.Comp.Laws § 600.721. Neither of these grounds can be invoked in the case at bar; Deer Creek has not consented to be sued in Michigan, and there is no contention that a continuous and systematic part of Deer Creek's general business is carried on there.

A subsequent section of the long-arm statute, Mich. Comp. Laws § 600.725, deals with what Professors von Mehren and Trautman have labeled "specific jurisdiction," or jurisdiction limited to the adjudication of "issues deriving from, or connected with, the very controversy that establishes jurisdiction to adjudicate." Von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 Harv.L.Rev. 1121, 1136 (1966). *Cf. Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984).

Mich.Comp.Laws § 600.725 provides that Michigan courts may exercise "limited" personal jurisdiction over foreign partnerships where the claim on which judgment is sought is one "arising out of" an act or acts creating any of five designated "relationships." Three of the named relationships (relationships involving in-state property, insurance, and contracts to perform services or furnish materials within the state) have no conceivable application in the present case. The two that might arguably apply are these:

"(1) The transaction of any business within the state.

(2) The doing or causing of any act to be done, or consequences to occur, in the state resulting in an action for tort."

Generally speaking, at least, "[t]he Michigan statute confers on the state courts the maximum scope of personal jurisdiction permitted by the due process clause of the Fourteenth Amendment." *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1236 (6th Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981). *Cf. Sifers v. Horen,* 385 Mich. 195, 188 N.W.2d 623 (1971) (Michigan legislature attempted to expand limited personal jurisdiction to the "full potential" allowed by the Federal Constitution.) [4]

The fountainhead of contemporary wisdom on what the United States Constitution permits in this respect is *International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). That was an action brought by the State of Washington to collect unpaid contributions to an unemployment compensation fund from a non-resident corporation that had employed 11 to 13 commission salesmen within the state over a four-year period. The defendant corporation exercised direct supervision and control over the salesmen, who both lived and worked in Washington. The men engaged there in a regular and systematic solicitation of orders which, when filled, produced a continuous flow of the corporation's product into the state. The obligation sought to be enforced "arose out of those very activities," which were "systematic and continuous throughout the years in question." *Id.* at 320, 66 S.Ct. at 160. Against this back-

---

**4.** Michigan may have stopped short of the constitutional limit, however, as far as actions for tort are concerned. *Rann v. McInnis,* 789 F.2d 374, 377 (6th Cir.1986), citing *Woodward v. Keenan,* 88 Mich.App. 791, 279 N.W.2d 317 (1979).

ground, the Supreme Court decided that the defendant's actual presence within the territorial jurisdiction of the state was not a prerequisite to a Washington court's exercise of personal jurisdiction over it: the defendant had "certain minimum contacts with [the territory of the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316, 66 S.Ct. at 158, quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940).

Whether "traditional notions of fair play and substantial justice" would be offended by a Michigan court's exercising personal jurisdiction over defendant Deer Creek on the strength of the largely fortuitous "contacts" that Deer Creek had with the State of Michigan is, no doubt, a debatable question. Clearly, however, Deer Creek's contacts with Michigan bear little resemblance to the far more substantial contacts in which the International Shoe Company engaged, over a period of years, with the State of Washington.

The "traditional jurisprudential premise" was that "the plaintiff should seek out the defendant." Von Mehren & Trautman, *supra,* 79 Harv.L.Rev. at 1148. (Von Mehren and Trautman observe that the traditional bias favoring defendants in this respect "is doubtless fully appropriate as between parties of relatively equal economic power and legal sophistication." *Id.* at 1147.) Traditions can change, however, and by 1957 the Supreme Court was remarking on a clearly discernable trend—a trend that neither began nor ended with the *International Shoe* decision—"toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents." *McGee v. International Life Insurance Co.,* 355 U.S. 220, 222, 78 S.Ct. 199, 200, 2 L.Ed.2d 223 (1957).

Less than a year later, on the other hand, the Supreme Court warned that "it is a mistake to assume that this trend heralds the eventual demise of all restrictions on personal jurisdiction of state courts." *Hanson v. Denckla,* 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958).

That warning remains fully operative today. The Supreme Court has "never accepted the proposition that state lines are irrelevant for jurisdictional purposes," nor could it do so without betraying "the principles of interstate federalism embodied in the Constitution." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 293, 100 S.Ct. 559, 565, 62 L.Ed.2d 490 (1980). *Cf. Denckla,* 357 U.S. at 251, 78 S.Ct. at 1238 (restrictions on state court personal jurisdiction "are a consequence of territorial limitations on the power of the respective States.") It is still incumbent upon the plaintiff to establish the requisite minimum contacts, as a condition to requiring an absent party to defend itself on the plaintiff's turf, and those contacts must still be sufficient to satisfy "traditional notions of fair play and substantial justice."

Even when anchored to the "traditional," of course, notions of what constitutes "fair play and substantial justice" can exhibit a fair amount of diversity. Not surprisingly, perhaps, *International Shoe* has spawned a vast number of judicial opinions—many of which have been cited to us here—in which courts have attempted to give content to these generalized notions in a variety of concrete factual settings.

In the leading case of *Southern Machine Co. v. Mohasco Industries,* 401 F.2d 374, *supra,*—a case which, like this one, involved limited (or "specific") jurisdiction—Judge Celebrezze, drawing on almost a quarter century of post-*International Shoe* caselaw, identified three criteria that must be met before such jurisdiction may be exercised:

"First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id.* at 381.

We have invoked these criteria often in the years since *Mohasco Industries* was decided. See, most recently, *Third National Bank of Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087 (6th Cir.1989). The district court sought to apply the *Mohasco Industries* criteria in analyzing the facts of the present case, and we shall do the same.

### III

### A

■ The first criterion—a showing that the defendant has "purposefully availed itself of the privilege of transacting business" in the forum state, thus invoking the benefits and protections of its laws—is "the *sine qua non* for *in personam* jurisdiction." *Mohasco Industries*, 401 F.2d at 381–82. That such a showing is "essential," see *Denckla*, 357 U.S. at 253, 78 S.Ct. at 1239, was re-emphasized by the Supreme Court in *Burger King*, 471 U.S. at 474–75, 105 S.Ct. at 2183–84, and in *Asahi Metal Industry Co., Ltd. v. Superior Court*, 480 U.S. 102, 112, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987). Even in a case where the cause of action arose in the plaintiff's home state, that state may not exercise *in personam* jurisdiction if the defendant has not purposefuly entered into a connection with it "such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567.

"This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts." *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183, quoting *Keeton v. Hustler Magazine*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) and *World–Wide Volkswagen*, 444 U.S. at 299, 100 S.Ct. at 568. There is a difference between what *World–Wide Volkswagen* calls a mere "collateral relation to the forum State," 444 U.S. at 299, 100 S.Ct. at 568, and the kind of substantial relationship with the forum state that invokes, by design, "the benefits and protections of its laws." *Denckla*, 357 U.S. at 253, 78 S.Ct. at 1239. An understanding of this difference is important to the proper application of the "purposeful availment" test.

The Supreme Court has emphasized, with respect to interstate contractual obligations, that "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473, 105 S.Ct. at 2182. The defendant in the case at bar, it seems to us, did not "reach out" to Michigan for the purpose of creating "continuing relationships and obligations" with any citizen of that state.

Defendant Deer Creek, it will be recalled, did not advertise the Cypress parcel for sale in Michigan or elsewhere.[5] Deer Creek had no "program" for seeking out prospective buyers in Michigan. *Cf. Rann v. McInnis*, 789 F.2d at 376. It was Beznos Realty, on the contrary, that reached out to Deer Creek in Florida—and it did so not for the purpose of creating any "continuing relationship" in Michigan, but for the purpose of making a cash purchase of a choice piece of real estate in Florida.

The purchase negotiations that began in Florida ripened into a binding contract only when defendant Deer Creek signed the final agreement back home in Indiana. (The place where the contractual obligation was incurred is a factor that courts often deem important, although it cannot normally be determinative. See, *e.g.*, *Denckla*, 357 U.S. at 251–52, 78 S.Ct. at 1238–39, and *Davis H. Elliott Co. v. Caribbean Utilities Co.*, 513 F.2d 1176, 1181 (6th Cir.1975).) The fact that Beznos Realty may have found it convenient to conduct some of the negotiations at long distance from Michigan is not of controlling significance, in our view.

5. The district court thought it significant that "Defendant solicited purchasers nationally," but the record does not disclose any national solicitation. Deer Creek did receive a number of *unsolicited* inquiries and offers, and that circumstance may well have encouraged it to hold firm on its price.

The telephone calls and letters on which the plaintiff's claim of jurisdiction primarily depends strike us as precisely the sort of "random," "fortuitous" and "attenuated" contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions.

A numerical count of the calls and letters has no talismanic significance: "The quality of the contacts as demonstrating purposeful availment is the issue, not their number or their status as pre- or post-agreement communications." *Stuart v. Spademan*, 772 F.2d 1185, 1194 (5th Cir. 1985). And the majority of the lawyers' telephone calls between Detroit and Indianapolis, for whatever that datum may be worth, were originated not by the defendant's lawyer, Mr. Backer, but by Mr. Mehr, the lawyer for Beznos Realty.

"The unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum State." *Helicopteros Nacionales*, 466 U.S. at 417, 104 S.Ct. at 1868, quoting *Denckla*, 357 U.S. at 253, 78 S.Ct. at 1239.[6] We are not prepared to hold that when Mr. Mehr placed calls to Mr. Backer in Indiana, the latter was required to hang up the phone if he wished to protect his client against a subsequent finding of "purposeful availment" of the benefits of the laws of whatever state or states the calls happened to come from. Mere awareness that Beznos Realty and its legal counsel were from Michigan clearly was not enough. See *Asahi Metal Industry*, 480 U.S. at 105, 107 S.Ct. at 1029.

Mr. Backer did, to be sure, originate some calls to Mr. Mehr, and he did send three draft contracts to Mr. Mehr in Detroit. (Deer Creek's refusal to adjust the purchase price was also confirmed by letter to Mr. Mehr, but that has little or no significance in this context.) On the facts of this case, however, we do not find these communications sufficient to establish "purposeful availment." Cf. *Scullin Steel Co.*

*v. National Railway Utilization Corp.*, 676 F.2d 309, 314 (8th Cir.1982) (The use of interstate facilities such as the telephone and the mail is a "secondary or ancillary" factor and "cannot alone provide the 'minimum contacts' required by due process"). See also *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026, 1029 (5th Cir.1983), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2180, 80 L.Ed.2d 561 (1984) ("As for the exchange of communications [by telex, telephone and letter] between Texas and Alaska in the development of the contract, that in itself is also insufficient to be characterized as purposeful activity invoking the benefits and protections of the forum state's laws"). On the record before us, to borrow from this court's language in *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 931 (6th Cir.1974), there is no reason to suppose that either Mr. Hasten, the general partner, or Mr. Backer, the lawyer, intended to lay himself open to liability "in every state of the union whenever [he made] telephone calls or wrote letters to a customer who [might subsequently claim] that they constitute[d] misrepresentations."

One of the Sixth Circuit decisions most pertinent to the present case on its facts is *Capital Dredge & Dock Corp. v. Midwest Dredging Co.*, 573 F.2d 377 (6th Cir.1978). The plaintiff in *Midwest Dredging*, an Ohio corporation, brought an action in Ohio on a contract with a foreign company under which the plaintiff had "taken back" a subcontract for a dredging project in Illinois. The contract on which suit was filed had been the subject of face-to-face negotiations in Arkansas and Florida, but modifications were negotiated in telephone calls placed by the plaintiff from Ohio, the forum state. The defendant mailed an amended contract to the plaintiff in Ohio, and a vice president of the defendant subsequently traveled to Ohio to obtain the plaintiff's signature on the contract and pick up a check there for $250,000, the initial payment under the agreement.

---

**6.** "The 'substantial connection' [citations omitted] between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.*" *Asahi Metal Industry*, 480 U.S. at 112, 107 S.Ct. at 1029 (1987). (Emphasis in original.)

Although the final signature was placed on the contract in the forum state at a time when an officer of the defendant corporation was physically present in that state, this court, speaking through Judge Peck, accepted the district court's characterization of the defendant's visit as "a convenience" to the plaintiff. *Id.* at 380. We agreed with the district court that the facts were "simply insufficient to establish long-arm jurisdiction over defendant." *Id.* Almost *a fortiori,* it seems to us, the facts of the present case are insufficient to establish long-arm jurisdiction over defendant Deer Creek—a defendant that never sent its representatives into the forum state, and that did not consummate the contract there.

The *Midwest Dredging* panel took pains to distinguish the facts in that case from the facts in *Mohasco Industries* and *In-Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220 (6th Cir.1972). The differences are no less instructive here.

The defendant in *Mohasco Industries* entered into a licensing agreement under which the plaintiff—which had its sole manufacturing plant in Tennessee, the forum state—was authorized to manufacture and sell machine attachments on which the defendant held patent rights. The agreement contemplated "a long continuing relationship" between the parties, and the defendant "retained substantial control over the manufacture and marketing of the attachments...." 401 F.2d at 385. The contract was "not a one-shot affair." *Id.* Because the manufacturing plant was located in Tennessee, that state had "a continuing interest in this continuing relationship, and apparently [the defendant] ha[d] a continuing interest in profiting from the Tennessee market." *Id.* at 385–86.

No such relationship was created by the real estate purchase agreement with which we are concerned in the case at bar, and defendant Deer Creek had no "continuing interest in profiting from the [Michigan] market." Plaintiff LAK makes a weak argument that Deer Creek might have been required to provide memberships in the recreational facilities it owned near the Cy-press parcel, and the parties could anticipate a continuing relationship as neighbors in Florida. That is a circumstance of no interest to Michigan, however, and it is one that could not reasonably be expected to have any significant impact on the commerce of Michigan. (We note also that if Beznos Realty chose unilaterally to perform work in Michigan on site plans, architectural renderings, and financial studies for the Florida property, that was a happenstance in which defendant Deer Creek had no continuing interest and over which it had no control.)

The *Van Dusen Air* case, like *Mohasco Industries,* involved a contract that contemplated the manufacture of a substantial quantity of goods in the forum state. The defendant company did not do business there directly, but it had a subsidiary in the forum state, and the defendant's officer met with the plaintiff in the city where the subsidiary was located to discuss delivery plans and the operational features of the goods being contracted for. As in *Mohasco,* this court found that the "purposeful action" requirement had been satisfied, in the context of a long-arm statute that spoke of "transacting any business" in the forum state, because "obligations created by the defendant or business operations set in motion by the defendant [had] a realistic impact on the commerce of that state," and the defendant "should have reasonably foreseen that the transaction would have consequences in that state." 466 F.2d at 226, quoting *Mohasco,* 401 F.2d at 382–83. That is not the situation here.

The commerce that was affected by the defendant's "purposeful action" in *Mohasco Industries* and *Van Dusen Air* involved, as we have noted, significant ongoing manufacturing operations within the forum state. (There is some similarity, it would seem, between these ongoing operations and the 20–year franchise relationship that was actively managed from the forum state in *Burger King.* See 471 U.S. at 480, 105 S.Ct. at 2186.) The case at bar involves no comparable operations in Michigan. Because the plaintiff was domiciled in Michigan, to be sure, the claimed injury to its purse might be said to have been

suffered there—but the *locus* of such a monetary injury is immaterial, as long as the obligation did not arise from "a privilege the defendant exercised in [the forum state]." *Denckla,* 357 U.S. at 252, 78 S.Ct. at 1239. With the benefit of hindsight, moreover, we know—because the jury so found—that the plaintiff in the case at bar suffered no damages as a result of the defendant's breach of duty.

This case is not comparable, we would add, to *Lanier v. American Board of Endodontics,* 843 F.2d 901 (6th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). There, as we observed, the defendant licensing board sought

> "to extend its influence and prestige in Michigan as the principal national determiner of special competence for the practice of endodontics. Thus, the real object of the Board's contacts with Michigan is to have ongoing, far-reaching consequences in the Michigan dental services market. These consequences are continuous and substantial, affording jurisdiction...." *Id.* at 911.

There has been no showing that the object of Deer Creek's contacts with Michigan was to have "ongoing," or "far-reaching," or "continuous," or "substantial" consequences in the Michigan real estate market, thereby affording jurisdiction to the Michigan courts.

### B

■ The plaintiff having failed to pass the "purposeful availment" test, we need not dwell on the other criteria of *Mohasco Industries;* each criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked. Following the lead of the lower court and the parties, however, we shall touch on the second and third criteria briefly.

We are not persuaded that plaintiff LAK has shown that its cause of action "arose out of" the defendant's activities in Michigan. Essentially, of course, the cause of action arose out of a failure to obtain approval from local authorities in Florida for construction of additional housing units

there, after the defendant had warranted, in an Indiana contract negotiated in several different states, that such approval would be forthcoming. If the contract had borne a more substantial relationship to Michigan, it would not have been necessary for the representations it embodied actually to have been made to the plaintiff in Michigan. See *WEDGE Group,* 882 F.2d 1087. Where the defendant's contacts with the forum state are as attenuated as they are here, however, we think it is incumbent on the plaintiff to show affirmatively that the fraudulent misrepresentations were actually made in the forum state. See *Serras v. First Tennessee Bank N.A.,* 875 F.2d 1212 (6th Cir.1989).

The plaintiffs in *Serras* were individual citizens of Michigan who had purchased an out-of-state restaurant on the strength of fraudulent misrepresentations as to its value. The documents consummating the sale were executed in Michigan. Not only had the defendant made its fraudulent misrepresentations in telephone calls initiated by it to the plaintiffs in Michigan, moreover, it had actually sent an agent into the state who continued the fraudulent conduct there in person. On these facts, the *Serras* panel found that there was no constitutional impediment to haling the foreign defendant before a court in Michigan. The panel went out of its way, however, to distinguish the sort of situation with which we are confronted in the case at bar:

> "We are not confronted here with a case in which the only alleged contact besides the plaintiffs' Michigan residency, is the defendant's making a telephone call from an out-of-state location to the plaintiffs in Michigan, seeking to solicit the plaintiff to engage in an out-of-state transaction. These facts are not sufficient to support long-arm jurisdiction. *Speckine v. Stanwick Int'l, Inc.,* 503 F.Supp. 1055, 1059 (W.D.Mich.1980). *In the present case, the plaintiffs rely not only on alleged telephone calls but also on an allegation that the defendant actually travelled to Michigan to solicit their business, and actually made fraudulent representations while in Michi-*

gan." 875 F.2d at 1217. (Emphasis supplied.)

The *Serras* panel went on to point out, in a passage particularly relevant here, that:

"The alleged fraudulent misrepresentations practiced upon plaintiffs within Michigan, both in the phone calls and during the visit of the Bank's agent, are an *element* of the cause of action itself. We therefore must reject the Bank's feeble argument that, if it had a duty to disclose anything, that duty could have been performed anywhere so that any failure to perform shouldn't be held to establish a Michigan contact. Plaintiffs have averred positive acts of misrepresentation in Michigan." *Id.* at 1218. (Emphasis in original.)

"The burden of establishing jurisdiction is on the plaintiff." *Welsh v. Gibbs,* 631 F.2d 436, 438 (6th Cir.1980), *cert. denied,* 450 U.S. 981 (1981); *WEDGE Group,* 882 F.2d at 1089. For all we can tell from the record in the case at bar, Beznos Realty's people were in Florida when they were told that the city would approve construction of an additional 532 units on the Cypress parcel. It is true that during a telephone conversation with Attorney Backer in Indiana, Mr. Mehr, the Michigan lawyer, proposed putting language to this effect in the contract. There was no showing that any misrepresentations were made in the course of this conversation, however—the district court confessed itself "without knowledge of the precise content of the conversation"—and as both Mr. Mehr and Mr. Beznos have acknowledged, the contract became binding only when it was signed in Indianapolis. On these facts, we do not believe that the plaintiff has sustained its burden of showing that its cause of action arose out of "positive acts of misrepresentation in Michigan." *Serras,* 875 F.2d at 1218.

C

Finally, notwithstanding the perhaps unreasonable length this opinion has already reached,[7] we add a word about "reasonableness."

In *Pickens v. Hess,* 573 F.2d 380 (6th Cir.1978), we affirmed a district court finding that it would not be reasonable for a Tennessee court to exercise jurisdiction in a dispute arising out of a contract for the construction of a house in Arkansas, notwithstanding that the plaintiff builder was from Tennessee and notwithstanding that the defendant's architect was also from Tennessee and had dealt directly with the plaintiff builder in that state with regard to the contract. In the case at bar the district court attempted to distinguish *Pickens* on the following grounds:

"Unlike the defendant in *Pickens,* the involvement of Deer Creek in this transaction is substantial enough to make it reasonable for this Court to assume jurisdiction over the parties. This forum has a vested interest in the outcome of this matter, particularly because Plaintiff and at least one Michigan banking institution are involved."

This attempt to distinguish *Pickens* is not persuasive, in our view. If Tennessee had no vested interest in the outcome of the Tennessee builder's dispute with a foreign owner over a contract for the construction of a house in Arkansas, we are something of a loss to see why Michigan should be thought to have a vested interest

---

7. If it suggests nothing else, this case may suggest that there is a downside, as well as an upside, to the judicially imposed requirement that each and every question of personal jurisdiction over a non-resident defendant be decided "on its own facts," *American Greetings Corp. v. Cohn,* 839 F.2d 1164, 1169 (6th Cir.1988), with counsel and court sifting through each new complex of facts in search of "contacts" demonstrating that the plaintiff's choice of a forum does or does not accord with the notions of "reasonableness" and "fair play" reflected in a vast number of fact-specific judicial opinions. More sharply defined standards might well reduce miscalculations on the part of lawyers who, not surprisingly, normally seek a home court advantage if they think they see some chance of getting it—and it is not inconceivable that clearer standards might lead to more expeditious and efficient resolution of those jurisdictional questions that counsel choose to fight out in court. In this particular case, diligent lawyers have favored us with several hundred case citations; scholarship that comprehensive carries obvious costs, both in time and in money.

in the outcome of a Michigan company's dispute with a foreign owner over a contract for the sale of a tract of land in Florida. That a Michigan plaintiff happens to be involved in the transaction is hardly enough: "If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." *Burger King,* 471 U.S. at 478, 105 S.Ct. at 2185.

If the Michigan bank on which Beznos Realty drew its $275,000 check for the earnest money was somehow "involved" in this transaction, moreover, the involvement is entitled to no consideration. See *Helicopteros Nacionales,* 466 U.S. at 416–17, 104 S.Ct. at 1872–73:

> "Common sense and everyday experience suggest that, absent unusual circumstances, the bank on which a check is drawn is generally of little consequence to the payee and is a matter left to the discretion of the drawer. Such unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." (Footnote and citations omitted.)

Plaintiff LAK suggests that it would be reasonable for the Michigan courts to exercise jurisdiction here because defendant Deer Creek was a "sophisticated business entity" that "stood to profit handsomely" from its transaction with the Michigan company. But the case law is quite clear that when the world beats a path to the door of one who has a better mousetrap for sale, the mousetrap seller, even if "sophisticated," does not automatically subject himself to suit in every part of the world from which mousetrap buyers chance to come. And when the buyer of the mousetrap is no less sophisticated than the seller, the buyer can hardly claim surprise at being told that jurisdiction over the seller's person is not dependent on the buyer's domicile.

The judgment of the district court is REVERSED, and the case is REMANDED with instructions that it be dismissed for want of personal jurisdiction.