DAVID A. NELSON, Circuit Judge.
 

 This is an appeal from the dismissal, for want of
 
 in personam
 
 jurisdiction, of an action arising from the alleged misappropriation of the design for a manufacturing plant in France. Development of the design was coordinated by the plaintiff, a Michigan consulting firm, pursuant to a letter agreement negotiated in Switzerland with a Swiss company that is one of two corporate defendants here. The agreement, which provided for joint ownership of the design, contained a provision stating that “[(jurisdiction for this contract is Berne, Switzerland, and it will be interpreted under Swiss law.”
 

 The United States District Court for the Eastern District of Michigan (Newblatt, J.) found that “the [Michigan] contacts of each defendant are sufficiently tenuous so that imposing this forum upon them would constitute a denial of their right to substantial justice.” The district court continued as follows:
 

 “The events in the commercial relationship took place primarily in Europe. Any tor-tious behavior that was committed occurred in France or Switzerland and not in the United States. The Court does not accept as a legal fiction that the situs of the tort is Michigan. Therefore, defendants lacked any reasonable expectation that their actions would subject them to suit in this forum.”
 

 As to three of the defendants (a French corporation and two individuals, one a resi
 
 *-1196
 
 dent of Switzerland and the other a resident of Austria), it seems very clear to us, upon
 
 de novo
 
 review, that the plaintiff faded to make a
 
 prima facie
 
 showing of personal jurisdiction. A closer case is presented as far as the Swiss company is concerned — but given the terms of the plaintiffs contract with that company, and given the Supreme Court’s admonition to exercise restraint in extending our notions of personal jurisdiction into the international field, see
 
 Asahi Metal Indus. Co., Ltd. v. Superior Court of California,
 
 480 U.S. 102, 115, 107 S.Ct. 1026, 1033-34, 94 L.Ed.2d 92 (1987), we conclude- that the plaintiff has failed to sustain its burden with respect to the Swiss company as well. To allow the suit to be maintained against this company in Michigan, we are satisfied, would offend “traditional notions of fair play and substantial justice.” See
 
 International Shoe Co. v. State of Washington,
 
 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The judgment entered by the district court will be affirmed as to all four defendants.
 

 I
 

 The French facility was designed for manufacturing flat sheets of glass through the use of a flotation process. In this “float glass process,” as it is often called, molten glass is floated on a bath of liquid tin, whence the glass is formed and drawn out in a continuous ribbon prior to being annealed and cut to size.
 

 The technology for the float glass process was developed by a British company, Pilking-ton Brothers, P.L.C., in the late 1950s and early 1960s. Pilldngton’s patents, trade secrets and expertise enabled that company to dominate the world float glass market for many years. As of 1992, we are told, there were approximately 140 glass manufacturing plants world-wide that employed the float process, and 95 percent of them were owned, operated, or licensed by Pilkington.
 

 With the expiration of some of Pilkington’s patents, and the acquisition by others of some of the company’s trade secrets and know-how, competitors found it feasible to enter the float glass field. The plaintiff in the case at bar, International Technologies Consultants, Inc., is an engineering consulting firm that appears to be a pioneer in the development of float glass designs competitive with, and independent of, the Pilkington design. International Technologies is a Michigan corporation with its principal place of business in Brighton, Michigan. It was founded in 1984 by a Michigan resident named Dean Wiley. Mr. Wiley, according to his affidavit, is Managing Director of the company.
 

 In the latter part of 1988 Mr. Wiley attended a convention in Düsseldorf, Germany. There he approached Heinz Trósch, one of the defendants herein, about building a float glass plant in Ohio or Pennsylvania. Mr. Trósch, a resident of Switzerland, is Chairman of the Board of Glas Trósch Holding A.G., the Swiss company subsequently named as a defendant in this action. Glas Trósch has its principal place of business in Bützberg, a city in the Province of Berne, Switzerland. The company has long been engaged in the business of distributing glass products in Europe.
 

 Mr. Trósch expressed interest in Mr. Wiley’s project, and in the spring of 1989 Glas Trósch began paying International Technologies for professional services and expenses related to the development of plans for a float glass facility that, as we shall explain, was subsequently abandoned. A letter of intent regarding the project was signed in June of 1989, and Donora, Pennsylvania, was chosen as the site of the proposed plant.
 

 International Technologies engaged a firm called Stewart Engineers & Associates to assist it on the Donora project. In November of 1989 Stewart was sued by Guardian Industries, Inc., a Pilkington licensee. Guardian claimed that Stewart had misappropriated trade secrets relating to float glass design. The Guardian lawsuit (to which International Technologies was subsequently made a party) created a substantial cloud over the Donora project, and Glas Trósch decided not to go forward with the venture. The record does not indicate that International Technologies ever gave Glas Trósch any of the trade secrets allegedly misappropriated by Stewart.
 

 
 *-1195
 
 Dean Wiley made several trips to Europe in late 1989 — early 1990, and in the course of these visits he negotiated a new letter of intent with Glas Troseh. It is this agreement that lies at the heart of the present controversy.
 

 The new agreement, entered into as of 27 February 1990 between Glas Troseh and Dean Wiley/International Technologies, was signed by Troseh in Switzerland and by Wiley in Michigan. The agreement recited, among other things, that Glas Troseh intended to build a float glass plant in Europe; that Dean Wiley was to prepare the plant layout, site definition and equipment specifications, was to secure proposals from suppliers, and was to support the efforts of Georg Grimm to secure permits for the plant;
 
 [1]
 
 that Wiley/International Technologies would “hand over to Glas Troseh complete plans and technical specifications and computer disks as well as all offers and proposals;” that Glas Troseh agreed to engage the services of Wiley/International Technologies through the end of 1991, with a possible extension through 1992, paying monthly compensation of $10,000 plus reimbursement of direct expenses; that when there was a final decision to go ahead with the European project, a project management contract would supersede this agreement and Wiley/Intemational Technologies would receive $150,000 per year during the construction phase, which would be followed by a payment of $1.5 million; that this compensation “will be paid and services will be considered to be rendered in the USA for tax purposes;” and that “[jurisdiction for this contract is Berne, Switzerland, and it will be interpreted under Swiss law.”
 

 International Technologies proceeded with the engineering and design work for the European project, retaining consultants in Michigan and other states to assist in this effort.
 
 [2]
 
 The consultants attended meetings at the offices of International Technologies in Michigan, and although they worked on detailed drawings in their home states, their work was reviewed and incorporated into the final plans in Michigan. International Technologies also opened an office in Mulhouse, France.
 

 In September of 1991 an amendment to the 1990 letter agreement was signed in Switzerland by Dean Wiley, acting for himself and International Technologies, and by Heinz Troseh, acting on behalf of Glas Troseh. The amendment recited, among other things, that as a result of information arising from the Guardian litigation, International Technologies “has been forced to develop a new Euroglas tin bath design;” that “[a]s previously foreseen in the contract the ownership of this design belongs to Glas Troseh Holding AG in Beme/Switzerland and also to I.T.C. [International Technologies] Inc.;” that International Technologies “guarantees that the new Euroglas tin bath design will be designed on the basis of public domain information and that it will work;” that the $1.5 million figure in the original contract was changed to $1 million; and that “[p]oint 14 and point 15 remain as in the original agreement.” (Point 14 of the original agreement made Wiley and International
 
 *-1194
 
 Technologies jointly liable for their contractual obligations. It was point 15 that placed jurisdiction for the contract in Berne,- Switzerland, and provided for interpretation under Swiss law.)
 

 A second amendment — signed by both parties in Switzerland in June of 1992 — extended the contract to 31 December 1992; reiterated that Glas Trósch and International Technologies “are both owners of the tin bath design and the related know how for the EUROGLAS plant in Hombourg (Hombourg design)” and that Glas Trósch “is entitled to have access to the outcome of all the work fulfilled by ITC in regard to the Hombourg design;” obligated the parties (subject to exceptions' set forth in the amendment) “to keep [the] Hombourg design confidential until the end of this agreement;” and specified, in paragraph 5, that if Glas Trósch or Eurog-las should “decide to build a float glass plant in Europe within the next two years without ITC for reasons beyond ITC’s responsibility then ITC shall be entitled to a compensation of lOOO’OOO US$ payable immediately.”
 

 In the fall of 1992, according to an affidavit subsequently executed by Hans Lüdi, International Technologies and Glas Trósch entered into negotiations for a contract to make International Technologies the project manager for the Euroglas project. The negotiations failed. On January 12, 1993 — shortly after the expiration of the letter agreement— a Swiss lawyer representing International Technologies requested that the plans for the Euroglas project be returned to him for safekeeping. The lawyer further requested that Trósch sign an undertaking not to use, copy or disseminate any of International Technologies’ intellectual property without prior permission. These requests were refused, and work on the Euroglas project proceeded on the basis of International Technologies’ plans (which were disclosed to third parties in Europe and elsewhere) but without International Technologies’ further participation.
 

 Glas Trósch maintains that it has already paid International Technologies over $1 million “for the plans, designs, related know-how and other services that are the subject of this litigation.” It is not our understanding that any payment was made to International Technologies under paragraph 5 of the 1992 amendment, however. We express no view as to whether International Technologies is entitled to such a payment, or as to whether International Technologies is entitled to additional compensation on any other theory.
 

 In the spring of 1993 International Technologies filed suit against Euroglas, Glas Trósch, Heinz Trósch and Georg Grimm in a Michigan circuit court. The complaint set forth claims for conversion of intellectual property, misappropriation of trade secrets, unjust enrichment, and unfair competition. In a telefax sent to Heinz Trósch in August of 1993, Dean Wiley explained that the dispute “reduces itself to a matter of contract interpretation.” Specifically, Mr. Wiley’s te-lefax continued, International Technologies “merely contends that the [contractual] right to the ITC intellectual property does not accrue to Euroglas unless and until a project management agreement, or some equivalent thereto, has been negotiated.”
 

 The lawsuit was removed on diversity grounds to federal court, where the defendants filed an answer asserting that the court lacked jurisdiction over their persons. Judge Newblatt held a case management conference that resulted in an order directing the defendants to “file a motion to dismiss, challenging this Court’s personal jurisdiction over them, and arguing that this matter should be litigated in a Swiss forum.” The plaintiff was directed to respond to the motion after completion of discovery on the jurisdictional issues.
 

 Soon after the case management conference, the defendants filed a motion, supported by affidavits and exhibits, asking for dismissal either on grounds of
 
 forum non conveniens
 
 or lack of personal jurisdiction. Upon completion of the discovery referred to in the case management order, and without requesting permission to conduct further discovery, International Technologies filed a brief (also accompanied by affidavits and exhibits) opposing the motion. The defendants then filed a reply brief, accompanied by further affidavits, supporting the motion. No one asked for an evidentiary hearing, and none was held.
 

 
 *-1193
 
 The documents filed in the district court spell out in considerable detail the facts summarized above. The facts are essentially undisputed. As far as the record discloses, moreover,
 

 — while defendants Glas Trosch Eurog-las had numerous contacts with International Technologies by telephone, teleco-py and mail, and Glas Trosch caused funds to be transferred to International Technologies in Michigan in response to invoices sent from that state, neither of the European companies ever maintained an office in Michigan or was ever qualified to do business there;
 

 — neither defendant Heinz Trosch nor defendant Georg Grimm ever resided in Michigan, or maintained an office there, or was ever personally present in Michigan on business relating to the French facility;
 
 [3]
 

 — except for an occasional visit by Hans Lüdi, and except for the presence of consultant Kenneth Putscher in Michigan during the three-month period when Putscher’s compensation was being paid by Glas Trosch, no other employee of Glas Trosch or Euroglas was ever personally present in Michigan on business relating to the French facility; and
 

 — none of the defendants ever designated an agent in Michigan to accept service of process.
 

 It was against this background that the district court entered its order granting the defendants’ motion and dismissing the case, without prejudice, for want of personal jurisdiction. International Technologies has perfected a timely appeal.
 

 II
 

 The burden of establishing jurisdiction over the persons of the defendants rests with the plaintiff.
 
 Third Nat’l Bank in Nashville v. WEDGE Group Inc.,
 
 882 F.2d 1087, 1089 (6th Cir.1989),
 
 cert. denied,
 
 498 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990);
 
 Theunissen v. Matthews,
 
 935 F.2d 1454, 1458 (6th Cir.1991). In a case such as the one before us, both state and federal law are relevant to the question whether the plaintiff has carried its burden. A federal court sitting in diversity may not exercise jurisdiction over a defendant unless courts of the forum state would be authorized to do so by state law — and any such exercise of jurisdiction must be compatible with the due process requirements of the United States Constitution.
 
 CompuServe, Inc. v. Patterson,
 
 89 F.3d 1257, 1262 (6th Cir.1996).
 

 Where there has been no evidentiary hearing to resolve apparent factual questions, the plaintiff need only make a
 
 prima facie
 
 showing of personal jurisdiction.
 
 Theunissen,
 
 935 F.2d at 1458. This proposition loses some of its significance, however, where, as in the case at bar, the plaintiff has received all of the discovery it sought with respect to personal jurisdiction and there does not appear to be any real dispute over the facts relating to jurisdiction. See
 
 Conti v. Pneumatic Prods. Corp.,
 
 977 F.2d 978, 980 (6th Cir.1992).
 

 Insofar as jurisdiction over the persons of defendants Heinz Trosch and Georg Grimm is concerned, the only potentially relevant Michigan statutes are Mich. Comp. Laws 600.701 and 600.705. The former statute authorizes Michigan courts to exercise “general personal jurisdiction” over individuals who are present in the state or domiciled there when process is served, or who consent to the exercise of jurisdiction. The latter statute authorizes Michigan courts to exercise “limited personal jurisdiction” and to render personal judgments “arising out of an act which creates any of [seven] relationships” enumerated in the statute. International Technologies has made a passing reference to Mich. Comp. Laws 600.705, but has offered no explanation of how either Mr. Trosch or Mr. Grimm could reasonably be thought to come within its provisions. On the face of the record, it does not appear to us that these individuals subjected themselves to any form of personal jurisdiction in Michigan.
 

 
 *-1192
 
 Insofar as the corporate defendants are concerned, International Technologies contends that limited personal jurisdiction exists under Mich. Comp. Laws 600.715(1) and (2). The relevant statutory language is somewhat convoluted, and we set it forth
 
 in extenso:
 
 “The existence of any of the following rela-
 

 tionships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:
 

 (1) The transaction of any business within the state.
 

 (2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.”
 

 The references in this statute to the transaction of business within the state and the tortious causing of consequences to occur in the state must be interpreted in the light of constitutional considerations about which much has been written. A large part of the contemporary caselaw in this area stems from
 
 International Shoe Co. v. State of Washington,
 
 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), a decision to which we turn next.
 

 “[I]n obedience to the law of parsimony of effort,” to borrow a phrase from Cardozo, we take the liberty of quoting the description of
 
 International Shoe
 
 given in
 
 LAK, Inc. v. Deer Creek Enters.,
 
 885 F.2d 1293, 1298-99 (6th Cir.1989),
 
 cert. denied,
 
 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990). As we explained there,
 

 “[International Shoe
 
 ] was an action brought by the State of Washington to collect unpaid contributions to an unemployment compensation fund from a nonresident corporation that had employed 11 to 13 commission salesmen within the state over a four-year period. The defendant corporation exercised direct supervision and control over the salesmen, who both lived and worked in Washington. The men engaged there in a regular and systematic solicitation of orders which, when filled, produced a continuous flow of the corporation’s product into the state. The obligation sought to be enforced ‘arose out of those very activities,’ which were ‘systematic and continuous throughout the years in question.’ [326 U.S.] at 320, 66 S.Ct. at 160. Against this background, the Supreme Court decided that the defendant’s actual presence within the territorial jurisdiction of the state was not a prerequisite to a Washington court’s exercise of personal jurisdiction over it: the defendant had ‘certain minimum contacts with [the territory of the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.’
 
 Id.
 
 at 316, 66 S.Ct. at-158, quoting
 
 Milliken v. Meyer,
 
 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940).”
 
 [4]
 

 The factual differences between the case at bar and
 
 International Shoe
 
 are both numerous and significant. Glas Trosch and Eurog-las are not American companies, for one thing, whereas the International Shoe Company was organized in the State of Delaware. International Shoe reached out to the forum state, employing a dozen or so salesmen there to promote a continuous flow of goods into the state. In the case at bar, by contrast, employees of Glas Trosch were present in the forum state only episodically, in furtherance of a contract (solicited by the plaintiff in Europe) under which the plaintiff agreed to provide the European purchaser with plans for a manufacturing facility to be built in Europe. And unlike the cause of action asserted in
 
 International Shoe
 
 — a claim for unemployment compensation taxes measured by wages the defendant’s employees had earned within the state — the cause of action asserted here, according to the plain
 
 *-1191
 
 tiff’s own managing director, “reduces itself to a matter of contract interpretation.” The contract in question is a European contract, of course, and the alleged misuse of the intellectual property purchased thereunder occurred outside the forum state.
 

 Although Glas Troseh — and Euroglas, to a lesser extent — unquestionably had “contacts” with the State of Michigan, it does not seem to us that the contacts were of a sort that could render the exercise of jurisdiction by Michigan compatible with traditional notions of fair play and substantial justice. The “traditional jurisdictional premise,” after all, was that “the plaintiff should seek out the defendant,” suing the defendant where he could be found.
 
 LAK
 
 885 F.2d at 1299, quoting Von Mehren & Trautman,
 
 Jurisdiction To Adjudicate: A Suggested Analysis,
 
 79 Harv. L.Rev. 1121, 1148 (1966). This premise, Von Mehren and Trautman observe, “is doubtless fully appropriate as between parties of relatively equal economic power and legal sophistication.”
 
 Id.
 
 at 1147. And the appropriateness of the premise is further enhanced, we believe, where it was the plaintiff that solicited the transaction later claimed to have given rise to jurisdiction in the plaintiffs home state. See
 
 Kerry Steel, Inc. v. Paragon Indus., Inc.,
 
 106 F.3d 147, 151 (6th Cir.1997).
 

 In determining what result traditional notions of fair play and substantial justice call for in a given ease — and each ease must be decided on its own facts, for better or worse, see
 
 LAK
 
 885 F.2d at 1304 n. 7 — we need to bear in mind that the concept embraced by the Supreme Court in
 
 International Shoe
 
 performs two functions:
 

 “It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.”
 
 World-Wide Volkswagen Corp. v. Woodson,
 
 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980).
 

 We have no reason to doubt that Michigan would be “a distant or inconvenient forum” as far as Glas Troseh is concerned. And we have no reason to doubt that this inconvenience explains why the contract negotiated with Glas Troseh in Switzerland contained a provision that not only specified the law of Switzerland as the law to be applied in construing the contract, but also placed “[j]uris-diction for this contract [in] Berne, Switzerland.”
 

 These provisions are not without relevance to the jurisdictional question presented here. See
 
 Burger King Corp. v. Rudzewicz,
 
 471 U.S. 462, 481-82, 105 S.Ct. 2174, 2186-87, 85 L.Ed.2d 528 (1985), where the Supreme Court made it clear that contractual choice-of-law provisions can play an important part in the jurisdictional analysis. And as the Supreme Court observed in
 
 World-Wide Volkswagen,
 

 “The Due Process Clause, by ensuring the ‘orderly administration of the laws,’
 
 International Shoe Co. v. Washington,
 
 326 U.S. at 319, [66 S.Ct. at 160] gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.” 444 U.S. at 297 [100 S.Ct. at 567],
 

 A key issue to be decided is whether “the defendant’s conduct and connection with the forum State are such that [the defendant] should reasonably anticipate being haled into court there.”
 
 Id.
 
 The terms of the contract under which International Technologies developed the Euroglas plans and turned them over to Glas Troseh strongly suggest that Glas Troseh should not have anticipated being haled into court in Michigan.
 

 Although, as we know, plaintiff International Technologies retained counsel in Switzerland, Michigan would obviously be a more convenient forum from the plaintiffs perspective than Switzerland would be. But the tortious character of the conduct of which International Technologies complains (conduct that took place outside of Michigan, we repeat) is a question that turns on the proper interpretation, under Swiss law, of a contract negotiated and signed by the defendant in Switzerland. The plaintiff having agreed that jurisdiction for the contract should be
 
 *-1190
 
 Berne, Switzerland, the plaintiffs current preference for Michigan merits relatively little weight, in our view.
 

 The interests of the forum state itself must be taken into consideration, to be sure, see
 
 Asahi Metal Indus. Co., Ltd. v. Superior Court of California,
 
 480 U.S. 102, 113, 107 S.Ct. 1026, 1032-33, 94 L.Ed.2d 92 (1987), but it is far from clear how well the interests of Michigan would be served by telling foreign purchasers of goods and services that if they sign a contract with a coloration, domiciled in Michigan, they run the risk of being haled into court in that state even if the contract provides for jurisdiction elsewhere. In any event, the totality of the facts presented here can leave little doubt, we think, that Michigan’s interests, whatever they may be, are outweighed by the interests of Switzerland, where the contract on which the plaintiffs case turns was negotiated.
 

 Because Switzerland is a foreign nation, its interests merit particular respect in our courts. See
 
 Asahi
 
 480 U.S. at 115,107 S.Ct. at 1033-34. The interests of foreign nations will differ from case to case, of course, but the
 
 Asahi
 
 Court went out of its way to give us the following message:
 

 “In every case ... those interests, as well as the Federal Government’s interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to . find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State.
 
 ‘Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.’ United States v. First Nat’l City Bank,
 
 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting).”
 
 Id.
 
 (Emphasis supplied.)
 

 With this injunction in mind, we are loath to conclude that an assertion of jurisdiction by Michigan in the ease at bar would be reasonable. On the contrary, we think it would be unreasonable.
 

 Our conclusion that it would be unreasonable for Michigan to assert jurisdiction over Glas Trosch or any of the other defendants in this case is not altered by the fact that International Technologies received payments from Glas Trosch in Michigan, or by reason of the recitation in the contract that International Technologies’ services “will be considered to be rendered in the USA for tax purposes.” A tax clause of this sort is not significant as far as personal jurisdiction is concerned.
 
 Growden v. Ed Bowlin and
 
 As
 
 socs., Inc.,
 
 738 F.2d 1149, 1152 (5th Cir.1984). It is clear, quite apart from the tax clause, that much of the development of International Technologies’ intellectual property took place in Michigan — but it is equally clear that the property had no physical situs there. Moreover, the acts giving rise to the lawsuit occurred outside Michigan. We are not here confronted with a libel case, where the tort is deemed to occur wherever the libelous material is circulated — and the fact that the claimed injury to the plaintiff’s purse may be said to have been suffered in Michigan is not material if the defendants did not purposefully avail themselves of the protection of Michigan law. See
 
 LAK,
 
 885 F.2d at 1302-03. We believe that Judge Newblatt was correct in rejecting Michigan as a situs for the torts complained of by International Technologies.
 
 [5]
 

 
 *-1189
 
 Nor is our conclusion altered by the fact that the defendants communicated with International Technologies in Michigan by letter, telephone, and facsimile. Such communications have no talismanic qualities, see
 
 LAK,
 
 885 F.2d at 1301, and the only reason the communications in question here were directed to Michigan was that International Technologies found it convenient to be present there. Glas Trosch was not attempting to exploit any market for its products in Michigan, and the company presumably would have been pleased to communicate with International Technologies wherever the latter wished. (By the same token, it was presumably immaterial to Glas Trosch whether International Technologies prepared the drawings, equipment specifications, etc. in Michigan, in Pennsylvania, or in some other state.) From the perspective of Glas Trosch, it was purely fortuitous that International Technologies happened to have a Michigan address.
 

 It was equally fortuitous that Michigan was the place where Hans Liidi visited International Technologies. Mr. Lüdi obviously picked Michigan as a “convenience” to the plaintiff, see
 
 Capital Dredge & Dock Corp. v. Midwest Dredging Co.,
 
 573 F.2d 377, 380 (6th Cir.1978), and his travel to Michigan has no particular jurisdictional importance.
 

 Of potentially greater significance, it seems to us, are the facts that as of January 1, 1992, Kenneth Putscher was engaged by Euroglas as a member of the engineering team for the Euroglas plant and was paid by Glas Trosch for three months’ work in Michigan. See n. 2,
 
 supra.
 
 The relationship that one or both of the corporate defendants had with Mr. Putscher at the beginning of 1992 doubtless makes this case a closer one than it would have been otherwise. Given the context in which the relationship was formed, however, and given the fact that the causes of action asserted by International Technologies did not arise until 1993 and stemmed from a contract with International Technologies, not from a contract with Mr. Putscher, we do not believe that the Putscher arrangement can carry the day for the plaintiff on the jurisdictional question.
 

 Finally, we turn to the tripartite jurisdictional test laid down by the court in
 
 Southern Mach. Co. v. Mohasco Indus., Inc.,
 
 401 F.2d 374, 381 (6th Cir.1968). Although now approaching its fourth decade, this test has not lost its usefulness as an approach for analyzing questions of limited
 
 in personam
 
 jurisdiction. See
 
 Kerry Steel,
 
 106 F.3d at 150. The test must never be applied mechanically, however; the Supreme Court has flatly rejected “any talismanic jurisdictional formulas,” and has repeatedly reminded us that the facts of each individual case must always be weighed in determining whether an exercise of personal jurisdiction would comport with fair play and substantial justice.
 
 Burger King,
 
 471 U.S. at 485-86, 105 S.Ct. at 2189-90.
 
 Cf. Kulko v. California Superior Court,
 
 436 U.S. 84, 92, 98 S.Ct. 1690, 1696-97, 56 L.Ed.2d 132 (1978).
 

 Mohasco’s three prerequisites for the exercise of
 
 in personam
 
 jurisdiction are as follows:
 

 “First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant’s activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.” 401 F.2d at 381.
 

 The most authoritative formulation of the first requirement, “purposeful availment,” has been provided by the Supreme Court: “it is essential in each ease that there be some act. by which the defendant purposefully
 
 *-1188
 
 avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.”
 
 Burger King,
 
 471 U.S. at 475, 105 S.Ct. at 2183, quoting
 
 Hanson v. Denckla,
 
 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). “This ‘purposeful availment’ requirement,” as the Court explained, “ensures that a defendant will not be haled into a jurisdiction solely as a result of ‘random,’ ‘fortuitous,’ or ‘attenuated’ contacts_” 471 U.S. at 475, 105 S.Ct. at 2183 (citation omitted).
 

 In the case at bar, of course, Glas Trósch expressly invoked the benefits and protection of Swiss law in negotiating and signing, on Swiss soil, the contract under which the validity of International Technologies’ claims will ultimately have to be determined. By its terms, the contract is to be interpreted under Swiss law. There was no purposeful availment of the benefits and protections of Michigan law here, and the defendants’ “contacts” with Michigan are too “fortuitous” and “attenuated” to suggest otherwise.
 

 The second component of the
 
 Mohasco
 
 test is that “the cause of action must arise from the defendant’s activities [in the forum state.]” As we have seen, International Technologies’ causes of action did not arise until after the expiration, on December 31, 1992, of the contract under which Glas Trósch acquired the intellectual property developed by International Technologies. The causes of action arose not from the defendants’ activities in Michigan, but from the use made of the intellectual property outside Michigan in alleged violation of an obligation that stemmed from the contract.
 

 The third component of the
 
 Mohasco
 
 test is that the defendant’s connection with the forum state must be substantial enough to make it “reasonable” for that state to exercise jurisdiction over the defendant. Here again, International Technologies fails the test. Nothing done by the European defendants in relation to Michigan can fairly be said to have given rise to a reasonable expectation of their being haled into court in Michigan.
 

 It would be eminently reasonable for Glas Trósch to be haled into court in Berne, Switzerland. And Dr. Franz Kellerhals, an attorney and law professor in Berne and former President of the Bernese Bar, has attested in an affidavit filed by the defendants that International Technologies could sue Glas Trósch in Berne under Swiss law for unauthorized use of plans disclosed in confidence; that any other party consenting to the Swiss forum could be joined in the action;
 
 [6]
 
 and that injunctive and/or monetary relief would be available to International Technologies under Swiss law. The accessibility of the forum named in the contract, and the adequacy of the remedies available in that forum, are not in dispute.
 

 We have attempted to give the particular facts of this case appropriately close scrutiny, bearing in mind the responsibility we have as an American court to exercise great care and “reserve” when it comes to extending our notions of personal jurisdiction into the international field. Our study of the record as a whole persuades us that it would be inconsistent with traditional American concepts of fair play and substantial justice for a Michigan court to assert personal jurisdiction over the Swiss, French, and Austrian defendants in this case. The order dismissing the case without prejudice for want of
 
 in personam
 
 jurisdiction is AFFIRMED.
 

 [1]
 

 . Georg Grimm, who like Heinz Troseh has been sued individually in this lawsuit, is an Austrian citizen who resides in Vienna. Named in the letter agreement as one of two “authorized representatives" of Glas Troseh (the other was a man named Hans Lüdi), Mr. Grimm became President-Director General of Euroglas S.A., a French corporation based in Mulhouse, France. Euroglas — also a defendant herein — was organized at the direction of Troseh to build a float glass plant in Hombourg, France. Dean Wiley and International Technologies were both issued one share of Euroglas stock, each share representing an interest of .025 percent in the company, but control rests with Glas Troseh, which owns a majority interest through a Dutch holding company.
 

 [2]
 

 . One such consultant was Kenneth Putscher, a resident of Belleville, Michigan, who signed an agreement with International Technologies in 1991. In December of that year, with International Technologies' consent, Hans Lüdi negotiated to hire Mr. Putscher as a direct member of the engineering team that was to plan, erect and operate the Euroglas float line. Mr. Putscher signed a “letter of intent/agreement” with Eurog-las that called for him to go to France after the commencement of construction work there; from January 1, 1992, through April 30, 1992, however, Glas Troseh paid him for working at his home in Michigan. Mr. Putscher then went back to work for International Technologies, which sent him a notice on November 15, 1992, terminating his 1991 contract effective as of December 31, 1992. Mr. Putscher has not worked on the Euroglas project since that time.
 

 [3]
 

 . We are told that one or more meetings did take place in Michigan in connection with the Dono-ra, Pennsylvania, project. That project was canceled, as we have seen, and the defendants are not accused of having misappropriated any plans for the Donora project.
 

 [4]
 

 . Given the facts of
 
 International Shoe,
 
 it is interesting that no fewer than seven members of the Supreme Court believed that the case presented a substantial constitutional issue. Justice Jackson did not participate. Justice Black, as he explained in a separate opinion (326 U.S. at 322, 66 S.Ct. at 161), would have "declinfed] the invitation to formulate broad rules as to the meaning of due process,” and would have dismissed the appeal as unsubstantial.
 

 [5]
 

 . In
 
 Paolino v. Channel Home Centers,
 
 668 F.2d 721, 724 n. 2 (3d Cir.1981), the Third Circuit stated that "[s]ince intellectual property cannot have a physical situs the law of the state of residence of the person who initially developed and protected the secret appears to be the obvious starting point for its protection.” The
 
 Paoli-no
 
 court was addressing a situation in which a Pennsylvania plaintiff had disclosed a trade secret to a Tennessee defendant under an agreement that obligated the defendant to hold the trade secret in confidence — but as far as we know, the agreement did not call for the application of Tennessee law and did not specify that jurisdiction would be in Tennessee. "In breach of [the] agreement,” the Third Circuit observed, "[the defendant] has manufactured and sold the devices for resale in Pennsylvania and elsewhere.”
 
 Id.
 
 at 723. Stressing that any potential unfairness in resorting to Pennsylvania as a forum would be mitigated by the district court's "power to grant a transfer motion under 28 U.S.C. § 1404(a),”
 
 id.
 
 at 725, the Third Circuit reversed an order in which the United States District Court for the Eastern District of Pennsylvania had dismissed the case for want of
 
 in personam
 
 jurisdiction.
 

 
 *-1189
 
 In the case at bar, of course, the contract that will have to be interpreted in deciding whether there was a breach of duty is a contract that calls for the application of Swiss law and identifies Switzerland as the jurisdiction of choice. The change of venue statute cited in
 
 Paolino,
 
 28 U.S.C. § 1404, could not be invoked to transfer this case to Switzerland. Under the circumstances, and given the domicile of the defendants in Europe, we see no irreconcilable conflict between our affirmance of the dismissal for want of jurisdiction here and the Third Circuit’s reversal of the dismissal in
 
 Paolino.
 

 [6]
 

 . The record shows that the defendants not domiciled in Berne will give such consent.