LUXOTTICA GROUP S.p.A., Plaintiff,

v.

BAUSCH & LOMB INCORPORATED, Defendant.

Bausch & Lomb Incorporated, Plaintiff,

v.

Luxottica Group S.p.A., Defendant.

Nos. 00 Civ. 1513(WHP), 00 Civ. 2546(WHP).

United States District Court, S.D. New York.

March 30, 2001.

Richard Lehv, Fross, Zelnick, Lehrman & Zissu, P.C., New York, NY, for Plaintiff.

Anthony DiSarro, Virginia Richard, Winston & Strawn, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

This breach of contract and trademark action arises out of the sale of Bausch & Lomb Incorporated's ("B & L") sunglass business to Luxottica Group S.p.A. ("Luxottica") in June 1999. In connection with that sale, the parties entered into a trademark license agreement, which permitted Luxottica to use certain B & L trademarks on sunglasses and related goods for a prescribed period. B & L claims that Luxottica breached that agreement and seeks a preliminary injunction enjoining Luxottica from using B & L's trademarks, from representing to the public that it is an authorized licensee of B & L, from diluting B & L's marks and from suggesting that its

goods are authorized by B & L. For the following reasons, B & L's motion for a preliminary injunction is denied.

### FACTS

B & L is a New York corporation with its principal place of business in Rochester, New York. Since 1853, B & L has been in the eyecare and eyewear business. (Kelly Aff. ¶ 2.) B & L employs thousands of employees in 35 countries, and last year generated revenues of over one billion dollars. (Kelly Aff. ¶ 2.) Most B & L eyewear bear the federally registered trademarks BAUSCH & LOMB, B & L, or an interlocking "B" and "L." (Kelly Aff. ¶ 2.)

Luxottica is an Italian corporation with its principal place of business in Italy. (Compl.¶ 1.) Founded in 1961, Luxottica has expanded its holdings to include such eyewear corporations as LensCrafters with 800 stores throughout the United States. (Giacobbi Aff. ¶ 2.) In 1999, Luxottica generated worldwide sales of approximately two billion dollars. (Giacobbi Aff. ¶ 2.)

On June 26, 1999, B & L sold to Luxottica its worldwide non-prescription sunglasses business for approximately $600 million dollars. (Kelley Decl. ¶ 7; Giacobbi Decl. ¶ 9.) As part of the sale, B & L transferred to Luxottica the RAY–BAN and KILLER LOOP trademarks and the Outlook trade name. (Webster Decl. ¶ 2.) Additionally, B & L gave Luxottica a limited license to use three of its trademarks: BAUSCH & LOMB, B & L, and interlocking "B" and "L" marks (collectively the "B & L Marks"). B & L also sold Luxottica sunglass inventory and various composite parts.

### The Trademark License Agreement

As part of the sale of B & L's sunglasses business, the parties entered into a trademark license agreement on June 25, 1999 (the "License Agreement"). That agreement was drafted by B & L. Under the License Agreement, B & L granted Luxottica permission: to use the interlocking "B" and "L" mark on non-prescription lenses on existing Ray–Ban eyewear for a limited period of time (License Agmt. ¶ 1.1.1); to sell off any inventory existing as of the closing date that uses the "Ray–Ban by B & L" mark stamped on the temple or crossbar in markets where those products were sold as of the June 25, 1999 closing date (License Agmt. ¶ 1.1.2); to use the B & L Marks in connection with packaging, promotional, and advertising materials for Ray–Ban sunglasses for one-year (License Agmt. ¶ 1.1.3); and to use the BAUSCH & LOMB mark in the form of "Outlook Eyewear by Bausch & Lomb" on existing packaging, promotional, and advertising material for Outlook sunglasses products existing as of the closing date for a limited period (License Agmt. ¶ 5). All of those license rights also encompass "[p]roduct line extensions [of the products covered by the License Agreement] so long as such extensions are consistent with brand marketing and positioning" as of June 1999. (License Agmt. ¶ 1.2.)

B & L retained the right to "review and approve ... all use of the B & L Marks ... before the use of [the products covered by the license]." (License Agmt. ¶ 4.1.) Luxottica could not use any items that B & L disapproved. (License Agmt. ¶ 4.1.) However, B & L approved Luxottica's use of any product line extensions of a License Product as permitted pursuant to Section 1.2 of the License Agreement. (License Agmt. ¶ 4.1.)

In the event that Luxottica breached the License Agreement, with some exceptions not relevant here, Luxottica had "30 days after receipt from [B & L] of a written notice of default within which to cure the

default to the reasonable satisfaction of [B & L] and to provide [B & L] with evidence that the default has been cured." (License Agmt. ¶ 7.3.) However, if Luxottica "after curing a material default under [the License Agreement] commit[ed] the same material default again, whether or not cured after notice," B & L could terminate the agreement on notice without permitting Luxottica an opportunity to cure. (License Agmt. ¶ 7.2.)

The License Agreement specifies that notice of default must be sent by overnight mail by courier of nationally recognized standing and addressed to Luxottica's chief executive officer in Italy with copies to the chief executive officer of LensCrafters in Cincinnati, Ohio, Roberto Cappelli at Clifford Chance in Italy, and Jonathan Goldstein at Winston & Strawn in New York, or such other address as Luxottica might designate in writing. (License Agmt. ¶ 11.) Notice is effective "upon receipt by the intended recipient." (License Agmt. ¶ 11.)

The License Agreement also confirms that use of the B & L Marks by Luxottica in violation of the agreement "constitutes trademark or service mark infringement and unfair competition and is likely to result in irreparable harm to [B & L]." (License Agmt. § 7.4.)

The License Agreement is a fully integrated agreement that "cannot be amended or modified except in a written instrument signed by the parties." (License Agmt. ¶ 13.)

*The Purchase Agreement*

The License Agreement is not a free standing agreement. It is "subject to the terms and conditions set forth in the purchase agreement," which had been signed two months earlier in April 1999. (License Agreement ¶ C.)

In the Purchase Agreement, B & L warranted that all of the inventory of the business, "consists of items of a quantity and quality currently usable and salable in the ordinary course of business consistent with past practices." (Purchase Agmt. ¶ 4.9.) The Purchase Agreement sets forth that the "[b]usiness [a]ssets and the services, rights and agreements described in the ... [License Agreement] (subject to the limitations therein ... ) ... constitute all of the assets, properties and rights used to conduct the Business [as of the closing date]." (Purchase Agmt. ¶ 4.4.)

Part of the inventory Luxottica acquired from B & L consisted of B & L sunglasses, parts, packaging and labeling. That inventory included Killer Loop sunglasses with labels affixed bearing the BAUSCH & LOMB trademark. The Killer Loop sunglasses also contained packaging inserts that referenced "Bausch & Lomb." (Giacobbi Decl. ¶ 30.)

*Manufacture, Distribution and Sale of Allegedly Infringing Goods*

During the summer and early fall of 1999, Luxottia sold the sunglasses inventory and used the parts and packaging it acquired from B & L. (Giacobbi Decl. ¶ 12.) Luxottica also began closing redundant manufacturing and assembling plants previously owned by B & L, and transferred the inventory of parts acquired from B & L to its factories. (Giacobbi Decl. ¶ 12.) It manufactured Killer Loop sunglasses in its own factories using the drawings and product specifications which it received from B & L in the acquisition, except as modified for product line extensions. (Giacobbi Decl. ¶ 12.)

Although the closing for the purchase of most of B & L's sunglass business occurred on June 25, 1999, the process of obtaining approval in certain foreign countries necessary to consumate the transaction could not be completed by that date.

(Giacobbi Decl. ¶ 13.) The Purchase Agreement allowed for that possibility by permitting deferred closings, which were to take place thirty days after the foreign government approval was obtained. (Purchase Agmt. ¶ 3.3.) According to Luxottica, the parties agreed that B & L would continue to operate any foreign facility that was the subject of a deferred closing between the June 1999 closing and the deferred closing date. (Giacobbi Aff. ¶ 14.)

One foreign plant subject to a deferred closing was B & L's manufacturing, assembly and distribution facility in Waterford, Ireland. (Giacobbi Decl. ¶ 13.) The parties were unable to close on the Waterford plant until the fall of 1999. Thus, from June 26, 1999 to the fall of 1999, the Waterford plant was staffed entirely with B & L employees who manufactured lenses and assembled sunglasses at issue in this infringement action. (Giacobbi Decl. ¶ 15.)

The parties cooperated after the closing by providing transition services which were set forth in a Transition Services Agreement signed at the closing. Pursuant to that agreement, B & L continued to supply distribution support for Luxottica. As part of the distribution support, B & L operated a sunglass distribution center in the Netherlands which distributed formerly B & L's and now Luxottica's Ray–Ban and Killer Loop sunglasses to retailers throughout Europe. (Giacobbi Decl. ¶ 16.) Some of the sunglass products at issue in this action were distributed by B & L employees from the Netherlands facility to Europe. (Giacobbi Decl. ¶ 17.)

In addition, Luxottica sold to B & L for resale to B & L's employees sunglass products that are the subject of this infringement action. (Giacobbi Decl. ¶ 18; see also Purchase Agmt. § 11.7.)

*Pre–Litigation Events*

In November 1999, Luxottica notified B & L that it was demanding a substantial adjustment to the purchase price it paid for B & L's sunglass business pursuant to the post closing price adjustment procedures set forth in the Purchase Agreement. (Giacobbi Decl. ¶ 20.) Luxottica maintained that B & L had overstated the net operating assets of the business and demanded a downward adjustment of the purchase price of almost $100 million. (Giacobbi Decl. ¶ 20.)

On January 5, 2000, B & L received a letter from an irate customer who had sent her "Revo" sunglasses to a repair center in September 1999 and demanded a refund when the sunglasses allegedly were never returned to her. The customer was under the impression that the repair center was controlled by B & L when it was actually controlled by Luxottica. (Webster Decl. Ex. 2: 12/29/99 Customer Complaint Letter.) B & L subsequently discovered that Luxottica had used B & L's name on customer correspondence concerning sunglasses in need of repair. (Webster Decl. ¶ 6.)

Patricia Hulley, senior in-house counsel for B & L, promptly faxed a copy of the customer letter to Michael Boxer, General Counsel and Director for Business Affairs for Avant–Guard Optics, a New York Corporation and an indirect wholly-owned subsidiary of Luxottica. Hulley also requested that Boxer "take immediate steps to assure that [references to B & L] are discontinued and to advise [his] customer service department to immediately cease using the Bausch & Lomb Incorporated name in conjunction with the products." (Webster Decl. Ex. 3: 1/5/00 Hulley Fax Cover Sheet.)

On January 31, 2000, Jon Webster, in-house trademark counsel for B & L, sent a letter to Boxer notifying him that Luxotti-

ca's licensee, Main Street Marketing, had referred to "Bausch & Lomb Outlook Eyewear" as well as using "Bausch & Lomb" and "Bausch & Lomb Eyewear" in a Visa/Master Card promotion. (Webster Decl. Ex. 7: 1/31/00 Webster Letter at 1.) Webster explained that the License Agreement only permitted Luxottica to use the designation "Outlook Eyewear by Bausch & Lomb." Webster "request[ed] that Luxottica confirm in writing that it [would] only reference 'Bausch & Lomb' in connection with Outlook Licensed Products as provided for in the [Licensing] [A]greement," and that it "acknowledge[ ] that there are no further promotional programs or materials that do not comply with the [License] Agreement." (Webster Decl. Ex. 7: 1/31/00 Webster Letter at 1.)

On February 9, 2000, Boxer notified Hulley that Luxottica's consumer relations department had eliminated reference to B & L from its customer letters. (Webster Decl. Ex. 5: 2/9/00 Boxer Letter.)

On February 17, 2000, B & L received another complaint from a customer who was under the misimpression that B & L was in charge of repairs. (Webster Decl. Ex. 4: 2/10/00 Customer Complaint Letter.)

Also on February 17, 2000, Hulley sent Boxer a letter confirming that she had received Boxer's February 9, 2000 letter assuring that Luxottica's customer service department was no longer referring to Bausch & Lomb. Nevertheless, Hulley found Boxer's letter insufficient to constitute a cure or provide evidence of a cure under the License Agreement and asked that he immediately "provide sufficient evidence of the alleged cure." (Webster Decl. Ex. 6: 2/17/00 Hulley Letter.)

Less than a week later, by letter dated February 23, 2000, B & L's General Counsel Robert Stiles informed Luxottica's Chief Executive Officer that B & L was terminating the License Agreement pursuant to § 7.2 "based on Luxottica's failure to remedy a breach of the License Agreement and repeated violations of the terms and conditions of that Agreement." (Webster Decl. Ex. 10: 2/23/00 Stiles Letter.) In support of the termination, Stiles cited the use of "Bausch & Lomb" in customer correspondence, which he claimed violated §§ 1.5(a), 1.5(c), 4.1, 5.1, 5.3 and 5.4 of the License Agreement, and Luxottica's "failure to cure ... or provide any evidence of cure within the time required by the [License] Agreement." (2/23/00 Stiles Letter at 1.) Stiles also asserted that even if Luxottica had cured the initial violation, it committed the same violation again by permitting Main Street Marketing to use the Bausch & Lomb mark in the Visa/Mastercard promotion. Additionally, Stiles charged that Luxottica was using the Bausch & Lomb name in packaging, labeling, package inserts, and for services connected with newly released models of Ray–Ban and Killer Loop sunglasses in further violation of the License Agreement. Stiles demanded that Luxottica immediately cease and desist all unauthorized use of B & L's marks and confirm that in writing by March 1, 2000. A copy of that letter was sent to Boxer, Roberto Cappelli, Jonathon Goldstein and the Chief Executive Office of LensCrafters as required under the notice provision of the License Agreement.

On February 28, 2000, Luxottica filed an action in this Court seeking a declaratory judgment that it had not violated the terms of the License Agreement. On March 3, 2000, B & L filed an action against Luxottica in the Western District of New York for trademark infringement, unfair competition, dilution and breach of contract. The parties agreed to consoli-

date those two actions before this Court.[1]

## DISCUSSION

### I. Preliminary Injunction Standards

A party seeking a preliminary injunction must establish that absent injunctive relief, it will suffer irreparable harm, and either that it is likely to succeed on the merits, or that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party. *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997). The plaintiff in a trademark infringement action establishes a likelihood of success by showing both a legal, exclusive right to the mark, and a likelihood that customers will be confused as to the source of the infringing product. *Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir.1999); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986).

In order to determine the likelihood of success of B & L's claim, this Court must address the following legal issues: (1) did Luxottica violate the terms of the License Agreement by referring to Bausch & Lomb in customer correspondence and if so, did B & L properly put Luxottica on notice of the violation and afford it a chance to cure as required by the License Agreement; (2) did Luxottica's use of the B & L Marks on parts of sunglasses other than lenses infringe B & L's trademarks. If B & L prevails on either question, then this Court must determine whether Luxottica's unauthorized use of B & L's marks blurs or tarnishes B & L's name under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c). Finally, if B & L has

demonstrated a likelihood of success on the merits of its claims of breach of contract, trademark infringement or tarnishment, then this Court must determine whether B & L will be irreparably harmed if a preliminary injunction is not granted.

### II. References to Bausch & Lomb in Customer Letters

Luxottica argues that reference to Bausch & Lomb as a corporate entity operating the customer service department does not violate the License Agreement because it was not using B & L's name in the trademark sense. While that argument raises an interesting question about what is a trademark, this Court need only reach the issue if B & L properly gave notice of default under the License Agreement. The latter question will be addressed first.

■ Under New York law, which governs this contract dispute (*see* License Agreement ¶ 12), when a party invokes a remedy of forfeiture based on failure to respond to a notice of default, that notice is scrutinized and any material defect will defeat the claim. *See, e.g., Filmline Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 518–19 (2d Cir.1989) (notice of termination that fails to comply with explicit notice requirements is inoperative under New York law); *Lurzer GMBH v. American Showcase, Inc.*, 75 F.Supp.2d 98, 102 (S.D.N.Y.1998) (party seeking forfeiture based on failure to respond to default notice will have their notice "scrutinized carefully and any inadequacy, no matter how trivial, will defeat the claim" under New York law), *aff'd mem.*, 1999 WL 1295917, 201 F.3d 431 (2d Cir.1999); *Siegel v. Kentucky Fried Chicken of Long Island, Inc.*, 67 N.Y.2d 792, 794, 501

---

**1.** B & L has withdrawn its claims regarding Luxottica's sale of RayBan sunglasses, its use of nose pads and cross bars containing the B & L Marks and Main Street Marketing's conduct. (*See* May 5, 2000 Oral Arg. Tr. at 22–23, 25; B & L Reply Br. at 7.)

N.Y.S.2d 317, 318, 492 N.E.2d 390 (1986); *Chinatown Apts., Inc. v. Lam*, 51 N.Y.2d 786, 787–88, 433 N.Y.S.2d 86, 88, 412 N.E.2d 1312 (1980).

█ Here, the License Agreement drafted by B & L provides that proper notice of default must be sent to four specifically enumerated individuals by overnight carrier. Hulley's casual January 5, 2000 note to Boxer was not addressed to the other three designated recipients under the License Agreement. It was merely typed on a fax cover sheet and faxed to Boxer.

B & L argues that Hulley sent the note to Boxer because Boxer and Stiles had agreed that Hulley would forward all legal issues to Boxer. In support of that argument, Hulley submitted a letter from Stiles to Boxer "confirm[ing][a] telephone conversation in which [they] discussed ... points for transitioning Eyewear business legal work from Bausch & Lomb to Luxottica." (Hulley Decl. Ex. A: 6/29/99 Stiles Letter ¶ 1.) Even if that letter was sufficient to alter the notice requirement under the License Agreement (which is unlikely since Boxer did not sign that letter and is not an officer of Luxottica), the January 5, 2000 note was not sent by overnight mail and did not refer to the License Agreement or request evidence of a cure. In fact, Hulley did not refer to the License Agreement or request evidence of cure until February 17, 2000.

While B & L's January 31, 2000 notice appears to be more proper in form, it too was faxed and sent only to Boxer. More importantly, after sending the January 31, 2000 notice, B & L did not give Luxottica thirty days to cure the alleged defect. B & L argues that it was not required to give Luxottica an opportunity to cure because the violations complained of were the same as earlier complaint. However, the January 31, 2000 letter complains of Main Street Marketing's use of "Bausch & Lomb Outlook Eyewear," "Bausch & Lomb" and "Bausch & Lomb Eyewear" in Visa/Mastercard promotions. In contrast, the January 5, 2000 note only objects to Luxottica's reference to Bausch & Lomb Incorporated as the party in charge of the repair service center in customer service letters. Further, as set forth above, the January 5, 2000 notice was inoperative. Therefore, Section 7.2(g) of the License Agreement, providing that B & L can terminate the Agreement if Luxottica after curing a material default commits the same material default again, was not triggered by the January 5, 2000 letter. B & L was thus required to give Luxottica thirty days to cure before unilaterally cancelling the License Agreement. Accordingly, B & L has not established a likelihood of success or a significant question going to the merits of its breach of contract claim.

### III. *Killer Loop Products*

█ B & L claims that Luxottica violated its BAUSCH & LOMB trademark by using it on Killer Loop lenses and packaging. B & L states without any supporting evidence that those Killer Loop products were not approved prior to the June 1999 closing. (Hulley Decl. ¶ 5.) However, B & L argues that irrespective of whether the products were offered for sale, were in production, or were approved prior to the closing, Luxottica was not permitted to use the BAUSCH & LOMB mark on Killer Loop products. Luxottica's use, it is argued, infringed B & L's trademark.

Luxottica responds with sample invoices sent by Killer Loop to B & L's headquarters a few days before the closing reflecting the sale of the Killer Loop models at issue. (Boxer Surreply Decl. ¶ 9 & Ex. 6.) Luxottica argues that because it purchased the disputed inventory from B & L

and because B & L approved that inventory for sale, it had a right to sell those goods. Luxottica also argues that B & L will not suffer irreparable harm from the sale of those goods because as of March 2, 2000, Luxottica instructed its facilities to remove and destroy all packaging and labeling referring to Bausch & Lomb prior to shipment of Killer Loop products. (Di-Benedetto Decl. Ex. 11: 3/2/00 Giacobbi Letter.)

"As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." *Polymer Tech. Corp. v. Mimran,* 975 F.2d 58, 61–62 (2d Cir.1992). Thus, a manufacturer who sells a branded product to a distributor without restriction cannot prevent the distributor from reselling the branded goods or demand that the distributor purchase a license or remove the mark. *Rogers v. HSN Direct Joint Venture,* No. 97 Civ. 7710(LLS), 1999 WL 728651, at *2–3 (S.D.N.Y. Sept. 17, 1999); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* 25:41 (4th ed.1997). That principle is commonly known as the exhaustion or first sale doctrine. While the exhaustion doctrine generally applies to third party distributors, it is also determinative here. Luxottica resold genuine goods produced or approved by B & L. B & L has not alleged any lapse in quality control or claimed that Luxottica has otherwise altered the goods, or that those alterations could be mistakenly attributed to B & L. Having sold the pre-approved Killer Loop goods with the BAUSCH & LOMB mark to Luxottica without any restrictions on their use, B & L cannot be heard to complain about Luxottica's resale of those goods.

IV. *Remaining Claims*

This Court need not reach B & L's dilution claim or determine whether B & L established irreparable harm because B & L did not demonstrate a likelihood of success or sufficiently serious questions going to the merits of its claims. However, the Court notes that prior to the commencement of this action, Luxottica removed all references to Bausch & Lomb Incorporated from its customer service letters and ceased distribution of Killer Loop sunglasses with packaging containing the BAUSCH & LOMB mark.

## CONCLUSION

For the foregoing reasons, Bausch & Lomb's motion for a preliminary injunction is denied.