NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0621n.06
Filed: August 23, 2006

No. 04-4383

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BURNSHIRE DEVELOPMENT, LLC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| CLIFFS REDUCED IRON | ) | OHIO |
| CORPORATION; LURGI | ) | |
| METALLURGIE GMBH, | ) | |
| | ) | |
| Defendants-Appellees. | | |

Before: BOGGS, Chief Judge; GIBBONS and GRIFFIN, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge**. Plaintiff-appellant Burnshire Development

("Burnshire") sued defendants Cliffs Reduced Iron Corp. ("Cliffs") and Lurgi Metallurgie GmbH

("Lurgi"), who together own all of the stock in Cliffs and Associates, Limited ("CAL"). Burnshire

entered into a Stock Purchase Agreement ("SPA") with Lurgi and Cliffs giving Burnshire the right

to purchase all of the CAL stock. Lurgi and Cliffs terminated the agreement before closing occurred

and Burnshire now claims that this termination violated the SPA. The district court granted Lurgi's

motion for dismissal pursuant to Fed. R. Civ. P. 12(b)(2) due to lack of specific personal jurisdiction.

The court separately granted Cliffs's motion for summary judgment, holding that the termination

was effective under the terms of the SPA. Burnshire appeals both the district court's jurisdictional

and merits holdings. For the following reasons, we affirm both orders.

1

I.

Cliffs, an Ohio-based, wholly-owned subsidiary of Cleveland-Cliffs, Inc., and Lurgi, a German company, established CAL to use Lurgi's production technology, Circored, to build and operate a hot briquetted iron production facility in Trinidad. Cliffs owned 82 percent of the CAL shares, and Lurgi owned the remainder. CAL completed the facility in 1998 and operated it intermittently until October 2001, when the facility was closed down.

Cliffs and Lurgi sought to sell CAL in January 2003. CAL created a data room to contain corporate documents in Cleveland in connection with the sale; it is unclear whether Lurgi played any role in the creation of the room. Several potential buyers visited the data room, including representatives from Kinder Morgan CO2, a firm based in Texas. After Kinder Morgan declined to purchase CAL, James Wuerth, a Kinder Morgan employee, founded Burnshire in order to attempt to purchase CAL. In July 2003, Burnshire, Lurgi, and Cliffs entered into the SPA, which provided that, after all preconditions to closing were met, Burnshire would purchase all outstanding CAL shares in exchange for $10,389.00, continued royalty payments, and payments for carrying costs between the signing of the SPA and the closing. Section 3.1 of the SPA provided:

> [T]he closing of the transactions contemplated hereby (the "*Closing*") will take place at the offices of Jones Day, . . . Cleveland, Ohio on the second Business Day following the satisfaction or waiver of each of the conditions set forth in Article VIII (other than those conditions that are to be satisfied at the Closing), or on such other date or at such other time and place as the parties mutually agree in writing (the "*Closing Date*")."

The remainder of Article III noted the deliveries required to be made at closing. Among these deliveries were a Licensing Agreement between Lurgi and Burnshire for Burnshire's global use of Circored technology, §§ 3.2(l), 3.3(c), and a Technical Services Agreement ("TSA"), §§ 3.2(m), 3.3(b), spelling out Burnshire's continued royalty obligations related to the operation of the Trinidad

2

facility.

Article VIII established the conditions to closing for each party. In addition to various conditions that could be satisfied "at or prior to" closing (including third-party consents or waivers and evidence of Burnshire's ability to finance $2.5 million of the funds required to restart the CAL facility), sections 8.2(b) and 8.3(b) required the parties to perform "[e]ach of the agreements and covenants" required by the contract to be performed "prior to the Closing Date." One precondition to closing is especially relevant to this appeal: the SPA incorporated a draft TSA that required that the parties enter into a final TSA "prior to the Closing Date." Finalization of the License Agreement between Lurgi and Burnshire was also contemplated prior to closing, but unlike the TSA, no draft of the licensing agreement was incorporated into the SPA.

The SPA was terminable according to Section 9.1, which provided:

[T]his agreement may be terminated at any time prior to the Closing Date:
***
(b) by buyer or the Stockholders, upon written notice to the other party, if the transactions contemplated by this Agreement have not been consummated on or prior to July 31, 2003.

The parties did not close by July 31, due at least in part to Burnshire's difficulty in obtaining the financing necessary to restart the CAL facility. Burnshire provides evidence via affidavit that it could meet the requirement of $2.5 million available financing but has conceded that $2.5 million was insufficient to restart the facility and that it had difficulty obtaining the $10 million that it deemed actually necessary to reopen the facility. Other potential buyers resurfaced in October 2003, and Wuerth responded by notifying Cliffs and Lurgi during a conference call on November 14, 2003, that Burnshire was "ready, willing, and able" to close. In a November 21, 2003, letter referencing the other potential purchasers, Wuerth reaffirmed Burnshire's readiness to close in early December. Lurgi and Cliffs initially agreed that closing could be effected by December 5, 2003.

3

On November 26, however, Cliffs discovered that, for tax reasons, the transaction as structured in the SPA would result in a multimillion dollar loss to Cleveland-Cliffs, Cliffs's corporate parent. As a result, both Cliffs and Lurgi (via its attorney-in-fact, Charles Banino) signed a written termination notice on the same day and transmitted it by facsimile to Wuerth. The parties thereafter began negotiating an asset sale in lieu of an SPA. The asset sale, however, was not concluded, and the CAL facility was sold to another company, International Steel Group.

Burnshire then sued Cliffs and Lurgi in United States District Court for the Northern District of Ohio, alleging breach of the SPA and seeking specific performance of the contract, a preliminary injunction to foreclose sale to International Steel Group, and damages. On February 20, 2004, the court denied Burnshire's motion for a preliminary injunction because Burnshire could not show a sufficient likelihood of success on the merits. It subsequently denied Burnshire's motion to reconsider or to certify an interlocutory appeal.

The court then turned to the dispositive motions. Arguing that it lacked the minimum contacts necessary to permit personal jurisdiction in Ohio, Lurgi moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(2).[1] Without holding an evidentiary hearing, the court granted the motion on July 24, 2004, holding that neither the Ohio long-arm statute nor the United States Constitution permitted it to assert personal jurisdiction over Lurgi.

Cliffs moved for summary judgment pursuant to Fed. R. Civ. P. 56. The court granted the motion on September 29, 2004, holding that Cliffs was within its contractual rights to terminate the

_____

[1] Lurgi's motion also requested dismissal for insufficient process under Fed. R. Civ. P. 12(b)(4) and insufficient service of process pursuant to Fed. R. Civ. P. 12(b)(5). Lurgi concedes that Burnshire has cured its objections on these issues. As a result, we need not consider whether Burnshire improperly served process on Lurgi.

SPA because the preconditions for closing were not met at the time of termination. It also found that the notice of termination was adequate to effect termination of the SPA and that Cliffs did not waive termination either by continuing to negotiate with Burnshire after termination or by mistakenly billing Burnshire for carrying costs for four days after termination.

Burnshire now appeals both the district court's dismissal of Lurgi and its grant of summary judgment in favor of Cliffs.

## II. LURGI

The district court determined that it lacked personal jurisdiction over Lurgi. A district court's dismissal for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure is reviewed *de novo*. *Brunner v. Hampson*, 441 F.3d 457, 462 (6th Cir. 2006). Burnshire bears the burden of showing that the court has personal jurisdiction over Lurgi. *Id.* (citing *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261-62 (1996)). "When, however, a district court rules on a jurisdictional motion to dismiss . . . without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff . . . . To defeat such a motion, . . . [the plaintiff] need only make a prima facie showing of jurisdiction." *CompuServe, Inc.*, 89 F.3d at 1262. "Furthermore, a court disposing of a 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal . . . because we want to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *Id.* (quotation marks, citation, and emphasis omitted).

## A.

In a diversity case, we examine the law of the forum state to determine whether personal jurisdiction exists. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). We must apply

5

a two-step test to determine whether the district court properly determined that it lacked personal jurisdiction as to Lurgi. First, we must determine whether Ohio law authorizes jurisdiction. *Brunner*, 441 F.3d at 463. If so, we must determine whether that authorization comports with the Due Process Clause of the Constitution. *Id.* The Ohio courts apply the same two-step test described by the Sixth Circuit to determine whether specific personal jurisdiction is appropriate. *Fallang v. Hickey*, 532 N.E.2d 117, 118 (Ohio 1988).

Jurisdiction over nonresidents in Ohio is governed by the state long-arm statute. Ohio Rev. Code § 2307.382. The statute permits state courts to exercise specific personal jurisdiction over claims "arising from," *inter alia*, a person's "transacting any business in [Ohio]" either directly or through an agent. *Id.* § 2307.382(A)(1). Where jurisdiction is based solely on the long-arm statute, "only a cause of action arising from acts enumerated in [§ 2307.382] may be asserted against [a defendant]." *Id.* § 2307.382(C). "[T]he [long-arm] statute and rule have engendered cases which have been resolved on highly particularized fact situations, [] rendering any generalization unwarranted." *Goldstein v. Christiansen*, 638 N.E.2d 541, 544 (Ohio 1994) (alterations and quotation marks omitted).

Under a constitutional analysis, our central inquiry is "whether minimum contacts are satisfied so as not to offend traditional notions of fair play and substantial justice." *Calphalon Corp.*, 228 F.3d at 721 (quotation marks omitted). In *Southern Machine Co. v. Mohasco Industries, Inc.*, our court established a three-part test for determining jurisdiction under this standard. 401 F.2d 374, 381 (6th Cir. 1968). "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences

6

caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id.*

The Ohio Supreme Court has determined that the long-arm statute is not fully coextensive with the jurisdictional demands of the Due Process Clause. *Goldstein*, 638 N.E.2d at 545 n.1 (noting that if the long-arm statute was coextensive with the bounds of the Due Process clause that the two-step analysis would be rendered nugatory); *see also Brunner*, 441 F.3d at 465 (recognizing the limitation imposed in *Goldstein*). Thus, our analysis is a bit convoluted. Moreover, the Ohio courts have not clarified the differences between state-law and constitutional analysis, and there are several ways in which the long-arm statute could differ from constitutional analysis.

One distinction between the long-arm statute and the United States Constitution is rooted in the "arising from" clause of § 2307.382(C), which requires that the defendant's actions in the state must be the proximate cause of the injury complained of; a "but-for" relationship is insufficient under Ohio law, though the latter standard satisfies the Constitution. *Brunner*, 441 F.3d at 466-67. By contrast, our court has suggested that the "transacting any business" standard does extend to the limits of the Due Process clause. *Brunner*, 441 F.3d at 465-66. *Brunner* did not explicitly determine the issue, however, as its holding relied solely upon its restrictive interpretation of the "arising from" clause. *Id.* at 466-67. We agree, however, that the "transacting any business" standard is coextensive with the Due Process Clause in that it requires both that the defendant have purposefully availed itself of the privilege of acting in Ohio or have caused a consequence in Ohio and that the act or consequence in Ohio be sufficiently substantial to support jurisdiction.

As to the latter prong, that is, the requirement that the act or consequence in Ohio is sufficiently substantial to support jurisdiction, the Ohio Supreme Court has held that, just as under

7

a constitutional analysis, "a nonresident's ties must 'create a substantial connection with the forum State'" in order to support jurisdiction under the "transacting any business" clause. *U.S. Sprint Commc'ns Co. v. Mr. K's Foods, Inc.*, 624 N.E.2d 1048, 1052 (Ohio 1994) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

With reference to the first prong, purposeful availment, the Ohio courts have not explicitly established their state's standard as being equivalent to the full reach of the federal Constitution. The purposeful availment prong is "essential" to a personal jurisdiction determination under the Constitution. *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989). "Even in a case where the cause of action arose in the plaintiff's home state, that state may not exercise *in personam* jurisdiction if the defendant has not purposefuly [*sic*] entered into a connection with it 'such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)). Under the purposeful availment prong, defendants cannot be sued "solely as a result of random, fortuitous or attenuated contacts" in a state. *Id.* (quotation marks omitted) (citing *Burger King*, 471 U.S. at 475). Parties, rather, are subject to jurisdiction only when they seek the benefit of operating in a state:

> There is a difference between what *World-Wide Volkswagen* calls a mere "collateral relation to the forum State," and the kind of substantial relationship with the forum state that invokes, by design, "the benefits and protections of its laws." . . . The Supreme Court has emphasized, with respect to interstate contractual obligations, that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequence of their activities.

*Calphalon Corp.*, 228 F.3d at 722.

Rather than rely on the mere existence of contacts with the forum state in determining purposeful availment, courts have inquired into the quality of those contacts. *Id.* (citing *LAK, Inc.*,

8

885 F.2d at 1301). Thus, the Supreme Court has "emphasized the need for a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King Corp.*, 471 U.S. at 479 (internal quotation and citation omitted); *see also Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 795-96 (6th Cir. 1996) (noting that it is imperative to focus on the defendant's actions, not those of unrelated entities).

The Ohio courts have construed the "transacting any business" clause broadly, *see Ricker v. Fraza/Forklifts of Detroit*, 828 N.E.2d 205, 209 (Ohio Ct. App. 2005) (citing *Ky. Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 559 N.E.2d 477, 480 (Ohio 1990)), lending credence to *Brunner*'s conclusion that the clause is coextensive with the parameters of due process. "Transact . . . means to prosecute negotiations; to carry on business; to have dealings. The word embraces in its meaning the carrying on or prosecution of business negotiations but it is a broader term than the word 'contract' and may involve business negotiations which have been either wholly or partly brought to a conclusion." *Ky. Oaks Mall Co.*, 559 N.E.2d at 480 (alterations and emphasis omitted) (quoting Black's Law Dictionary 1341 (5th ed. 1979)); *see also Goldstein,* 638 N.E.2d at 544. This definition comports with Sixth Circuit's view of contracting as purposeful availment; in *Calphalon Corp.*, we agreed that, as under Ohio law, the mere existence of a contract is insufficient to support jurisdiction. 228 F.3d at 722. Similarly, as under the Constitution, mere solicitation of business in Ohio is insufficient to create jurisdiction, *U.S. Sprint Comm. Co.*, 624 N.E.2d at 1052, as is activity

having a mere impact on commerce in Ohio, *Ucker v. Taylor*, 596 N.E.2d 507, 508 (Ohio Ct. App. 1991) (citing *Ohio State Tie & Timber, Inc. v. Paris Lumber Co.*, 456 N.E.2d 1309, 1312 (Ohio Ct. App. 1982)). These holdings are in complete agreement with constitutional holdings disallowing reliance on random, fortuitous, and attenuated contacts and instead emphasizing the importance of ongoing, substantive contacts in the forum state. As a result, we conclude that the Ohio "transacting any business" standard is coextensive with the purposeful availment prong of constitutional analysis.

Based on the identical standards used to interpret the "transacting any business" standard and the "purposeful availment" and "substantial connection with the forum state" prongs of our *Southern Machines* test, we now expressly adopt *Brunner's* suggestion that "transacting any business" is coextensive with the Due Process clause. As a result, after determining which of Lurgi's contacts with Ohio apply under the long-arm statute for purposes of the "arising from" standard, we apply the remaining prongs of the constitutional analysis.[2]

B.

Burnshire alleges that Lurgi injured it by terminating the SPA and selling its CAL shares to another entity. In order for this injury to permit jurisdiction over Lurgi in Ohio, Lurgi's Ohio contacts must have been proximately related to the termination. Burnshire purports to identify several contacts by Lurgi in Ohio in connection with the SPA. First, the SPA itself identifies an Ohio location for the closing. Second, Lurgi's representative, John Bonestell, allegedly visited Cleveland to market CAL to Burnshire. Third, Lurgi allegedly invited Burnshire's president, James

---

[2] The requirement that contacts be the proximate cause of the asserted harm to satisfy the long-arm statute is necessarily more restrictive than the but-for "arising from" standard applicable in the due process context. As a result, we need not apply the constitutional analysis to the "arising from" prong of the *Southern Machines* test.

Wuerth, to Cleveland to discuss the sale. Finally, the CAL data room was located in Cleveland. Burnshire has conceded that general personal jurisdiction will not lie against Lurgi, meaning that Lurgi's other Ohio contacts, such as unrelated contacts between Lurgi and Cliffs, cannot support jurisdiction. Ohio Rev. Code § 2307.382(C). It is therefore immaterial that Lurgi continues to market technology in Cleveland, that CAL was formed in Cleveland, or that CAL board meetings occurred in Cleveland.

As the district court noted, several of Burnshire's allegations are not supported by any record evidence despite Burnshire's ample opportunity to conduct discovery on the issue. Though we must view the evidence in a light most favorable to Burnshire, *Calphalon Corp.*, 228 F.3d at 721, it is not required to accept allegations that are completely unsupported by the evidence. In this case, most of Burnshire's allegations of contacts with Lurgi in Ohio in connection with the SPA are unsupported. Burnshire cites solely Bonestell's deposition in support of its claims that Bonestell and Wuerth met in Cleveland. That deposition, however, contains no indication that Bonestell and any Burnshire representative were in Cleveland at the same time. Instead, the deposition notes only that Bonestell traveled to Houston with a Burnshire representative, Britt Gilbert, in connection with a different, proposed application of Circored technology with Kinder Morgan and that Gilbert traveled *to Germany* in connection with the SPA. Other evidence indicates that Wuerth did travel to Cleveland, but he did so not in connection with the sale to Burnshire, but rather in connection with his employment by Kinder Morgan. Even assuming *arguendo* that Wuerth met with Bonestell during this visit, Burnshire would be unable to rely upon this connection because this contact with Lurgi was made on behalf of Kinder Morgan, not Burnshire. Under the Ohio long-arm statute, Ohio Rev. Code § 2307.382(C), this contact cannot serve as the nexus for Burnshire's assertion of

11

jurisdiction because it is not proximately related to Burnshire's injuries. *Brunner*, 441 F.3d at 466-67. As a result, the only two contacts that satisfy the "arising from" standard are the contractual language regarding closing and the fact that the data room was located in Cleveland.[3]

We next consider whether these contacts are sufficient to support the conclusion that Lurgi purposefully availed itself of the privilege of acting in Ohio or had a substantial connection with Ohio. We conclude that Lurgi's contacts with Ohio are too attenuated and fortuitous to support jurisdiction in this case. First, Lurgi agreed to close the SPA in Ohio,[4] but did so only as a small part of its agreement with a Texas firm (Burnshire) to sell shares in a Trinidadian corporation pursuant to a contract to be interpreted under New York law. If a contract with a citizen of the forum state is insufficient on its own to satisfy the demands of due process, *see Burger King Corp.*, 471 U.S. at 478, a single provision in a contract with an out-of-state resident surely cannot alone support jurisdiction. More importantly, the SPA envisioned no ongoing relationship between Lurgi and Ohio. Its agreement to close in Ohio, rather, was a result of Cliffs's location in the state, and its ongoing contacts with Ohio were nonexistent. This case is thus distinguishable from cases such as *Burger King*, wherein the Supreme Court, in finding jurisdiction, noted the ongoing nature of the defendant franchisor's contractual relationship with its corporate parent. 471 U.S. at 479. As a result, neither the SPA itself or the contacts envisioned by that contract establishes a "substantial

---

[3] The data room was established in a generalized attempt to sell CAL – not in connection with the SPA – and is thus arguably not a proximate cause of Burnshire's specific asserted injuries. We assume *arguendo*, however, that the creation of the data room is proximately related to the transaction at issue.

[4] Contrary to the district court's assertion, Lurgi's connection with Ohio need not be physical. "[P]ersonal jurisdiction does not require physical presence in the forum state." *Goldstein*, 638 N.E.2d at 544; *see also CompuServe, Inc. v. Patterson*, 89 F.3d at 1264.

connection" with Ohio. *Id.*[5]

It is also important to note that Lurgi's agreement to close the SPA in Cleveland was largely due to the fact that Cliffs – CAL's majority shareholder – was headquartered in Cleveland. Closing must happen somewhere, and to hold that Lurgi could be haled into court on the basis of the closing location would hold firms hostage to their co-contractors while ignoring the real relations of the parties. This court held in *International Technologies Consultants, Inc. v. Euroglas S.A.* that the Swiss defendant lacked the minimum contacts necessary to support jurisdiction in Michigan notwithstanding several forms of communication with the Michigan plaintiff. 107 F.3d 386 (6th Cir. 1997). We explained:

> [T]he only reason the communications . . . were directed to Michigan was that . . . [the plaintiff] found it convenient to be present there. . . . [The defendant] was not attempting to exploit any market for its products in Michigan, and the company presumably would have been pleased to communicate with . . . [the plaintiff] wherever the latter wished. . . . From the perspective of . . . [the defendant], it was purely fortuitous that . . . [the plaintiff] happened to have a Michigan address.

*Id.* at 395. As in *Euroglas*, Lurgi's connections with Ohio were a matter of convenience. Indeed, this case is even more attenuated than *Euroglas*, as Lurgi dealt in Ohio because co-defendant Cliffs – not plaintiff Burnshire – was located there. Lurgi's contacts with Ohio are too fortuitous to support jurisdiction here.

The location of CAL's data room is similarly fortuitous, dependent as it was on the convenience of having CAL's corporate records close at hand. As a result, even if Lurgi aided CAL in establishing the data room (an assertion without evidentiary support), it would be insufficient to

---

[5] It is similarly obvious that the termination of the SPA caused no consequences to Burnshire within the state of Ohio. As a result, the "causing a consequence" language of the *Southern Machine* test, 401 F.2d at 381, is inapposite in this case.

support jurisdiction. Moreover, the location of the room is largely immaterial to *Lurgi's* presence in Ohio because CAL is not the subject of the suit. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum State.").

## C.

Burnshire makes the final argument that it should have been allowed discovery to determine Lurgi's personal jurisdiction. Additional discovery would serve no purpose, as Burnshire has already deposed Lurgi's representative and its own employees and thus had ample opportunity to uncover any facts that would have aided its jurisdiction argument. Further, the decision whether to grant discovery or an evidentiary hearing before ruling on a 12(b)(2) motion is discretionary. *Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005). As was the case in *Intera Corp.*, Burnshire makes no argument that this determination was an abuse of discretion, nor could it succeed had it done so. Under these facts, we decline to remand for further discovery on the jurisdictional issues.

Burnshire has failed to show that Lurgi had substantial connections with Ohio sufficient to satisfy either the Ohio long-arm statute or the demands of due process. As a result, we affirm the district court's July 24, 2004, order dismissing the claims against Lurgi.

## III. CLIFFS

We review a district court's grant of summary judgment *de novo*. *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County*, 430 F.3d 783, 787 (6th Cir. 2005). This case presents questions of contractual interpretation under New York law. "The threshold issue in matters of contract

14

interpretation is whether, on its face and without reference to extrinsic evidence, the contract is reasonably susceptible of more than one interpretation. Resolution of this issue presents a question of law for the court. If the contract is determined to be unambiguous on its face, absent the presence of any colorable defenses to its enforcement, it will be upheld according to its terms." *Beltrone Const. Co. v. State*, 592 N.Y.S.2d 832, 834 (N.Y. App. Div. 1993) (internal citations omitted).

The district court granted Cliffs's motion for summary judgment because it found Cliffs's termination to be valid based on the unambiguous terms of the SPA. On appeal, Burnshire raises two arguments. First, it argues that the contractual language does not permit termination after the "Closing Date," which under its interpretation of the SPA occurred on November 14, 2003. Second, it argues that the termination notice itself was either invalid because improperly delivered or waived when Cliffs accepted carrying costs from Burnshire for four days after the termination.

Burnshire expends considerable effort in arguing that, under § 9.1(b), Cliffs could not effectively terminate the agreement more than two business days after the satisfaction of all conditions precedent to closing (*i.e.*, after the "Closing Date" as defined in § 3.1) unless the parties agreed on a different Closing Date.[6] Assuming *arguendo* that this analysis is correct as a matter of law,[7] the determinative question in the case is whether the parties satisfied all conditions precedent to closing on November 14, 2003, as Burnshire claims. If not, Wuerth's notice that Burnshire was

---

[6] Though there is no joint writing adopting a particular Closing Date other than the SPA default, it is clear that Burnshire itself did not anticipate closing before December 2003, communicating to Cliffs that "we would plan to close on Monday December 1, 2003." As noted *infra*, it is unnecessary to determine whether Burnshire's actions – seemingly contradictory to its contentions before this court – would alter the Closing Date, as there are independent, uncontroverted reasons why the SPA could not close in November 2003.

[7] This reading is consistent with the plain language of the contract, and Cliffs raises no argument regarding the interpretation.

15

"ready, willing, and able" to close on that date was not effective, and Cliffs's notice of termination was timely under the SPA.

Burnshire argues that the language in Article VIII allowed it to satisfy all preconditions to closing "at or prior to closing," so that its determination, after examining the facility, that it desired to consummate the sale was sufficient to create a Closing Date. Though Burnshire is certainly correct that it could satisfy *most* of conditions at closing rather than prior to closing, it ignores language specifically requiring finalization of the TSA *prior to* closing, the need to create the Licensing Agreement before closing, and the requirement that Burnshire "shall have" provided Cliffs with both third-party consents or waivers and evidence of its ability to finance $2.5 million before closing. It is undisputed that the parties had not finalized the TSA or the Licensing Agreement on November 14, 2003, nor had Burnshire provided evidence of its ability to finance by that date.

The failure to satisfy these preconditions to closing vitiates Burnshire's argument and is dispositive of this issue. The TSA was arguably the most important component of the deal from Cliffs's perspective – far more so than the $10,389.00 purchase price – because it established Burnshire's ongoing obligations to pay Cliffs a percentage of the revenue from the operation of the CAL facility. Without an agreement on this highly material issue, a determination that the SPA could close would be incorrect as a matter of both common sense and contractual interpretation. The Licensing Agreement was similarly a material precondition to closing, as it was to determine Burnshire's ongoing right to use Circored technology, both at the Trinidad facility and elsewhere. Burnsire has failed to produce even a draft Licensing Agreement, lending further credence to Cliffs's argument that the deal could not close on November 14.

16

The language in §§ 8.2(d)-(e) similarly required action by Burnshire before closing could occur. Those sections respectively provide that Cliffs "shall have received" from Burnshire or the appropriate third party both: (1) "the consents or waivers set forth on Schedule 8.2(d); and (2) "evidence of Buyer's ability to finance at least $2.5 million of the funds required by [Burnshire] to fulfill its obligation." The "shall have received" language modifies the general language that Burnshire's performance may occur "at *or* prior to" closing to require delivery of these items *prior* to closing. Burnshire never produced the required third-party consents, and though it introduced evidence into the record that it had $2.5 million in financing available, it never notified Cliffs that this funding source was available, as required by the SPA. As a result, Burnshire failed to meet the preconditions to closing listed in sections 8.2(d)-(e) of the SPA.

Whether or not Burnshire could unilaterally effect closing, it certainly could not do so merely by indicating that it was ready to close when substantial preconditions to closing remained unfulfilled. As several material preconditions in fact remained unsettled, Burnshire's claim that the Closing Date preceded the termination in this case is incorrect as a matter of law.

Burnshire argues that, even if termination was not barred by the passage of the closing date, the court should not enforce a unilateral termination of an unambiguous contract between sophisticated parties because the contract required Cliffs to sell the stock. This argument is not compelling. Burnshire negotiated for unilateral termination and had the same termination rights as Cliffs, so it cannot now escape its bargained-for terms by referring to mandatory language in the sales provision of the contract while ignoring the conditions to that mandatory sale imposed in other

17

provisions.[8]  Contrary to Burnshire's contention, courts applying New York law have been willing

to enforce clauses reserving the power to terminate contracts without notice where such a provision

is the result of an understanding of the parties to the contract, regardless of the reasons for

termination.  *See Red Apple Child Dev. Ctr. v. Cmty. Sch. Dists. Two*, 756 N.Y.S.2d 527, 529 (N.Y.

App. Div. 2003) ("It is a well-established principle of law that when a contract affords a party the

unqualified right to limit its life by notice of termination that right is absolute and will be upheld in

accordance with its clear and unambiguous terms."); *A.J. Temple Marble & Tile, Inc. v. Long Island

R.R.*, 682 N.Y.S.2d 422, 423 (N.Y. App. Div. 1998); *see also Gray v. American Exp. Co.*, 743 F.2d

10, 18-19 (D.C. Cir. 1984) (applying New York law in overturning termination without notice where

termination clause allowed credit card issuer to "refuse to honor charges long since incurred" but

noting the enforceability of unilateral termination generally).  The contractual language in this case

clearly and unambiguously grants either party the right to terminate the agreement, and we honor

the agreement of the parties on this issue.[9]

We thus conclude that Cliffs was within its legally-enforceable contractual rights to

---

[8] For the same reason, the termination provision does not, as Burnshire contends, render
the contract illusory.  When the other mandatory conditions are considered, the contract is
clearly more than illusory. Perhaps most obviously, the contract did not allow unilateral
termination until July 31, 2003; before that date, both parties were required to agree on
termination.  The contract thus bound the parties to each other for a limited time before allowing
unilateral termination.

[9] Burnshire cites some precedent indicating that courts should strictly construe forfeiture
clauses, *see, e.g., Luxottica Group S.P.A. v. Bausch & Lomb Inc.*, 160 F. Supp. 2d 545, 550
(S.D.N.Y. 2001); *Lurzer GmbH v. American Showcase, Inc.*, 75 F. Supp. 2d 98, 102 (S.D.N.Y.
1998), but as the district court noted, these cases are irrelevant because forfeiture requires the
acquisition of a property right in the thing forfeited, which is not the case here.

18

terminate the SPA because Burnshire failed to comply with conditions precedent to closing.[10]

Burnshire's second argument is that Cliffs's notice of termination was insufficient because it was delivered improperly and was waived by the acceptance of payment for carrying costs for the four days in November 2003, after the termination of the SPA. Section 11.6 of the SPA required notice to be provided "in writing, and sent by facsimile transmission (electronically confirmed), delivered in person, mailed by first class registered or certified mail, postage prepaid, or sent by Federal Express or other overnight courier of national reputation." Notice was to be sent to Burnshire and to its counsel.

It is undisputed that Cliffs sent notice to Burnshire's attorney; on learning that Wuerth was at the attorney's office and at Wuerth's direction, it then sent a second notice to Wuerth at that location rather than at its office. The notice to Wuerth was thus technically incorrect. The district court properly held, however, that this defect is insufficient to overcome the notice. Relying on several forfeiture cases, Burnshire claims that any defect in a notice of termination will defeat the termination. *See Luxottica Group S.P.A. v. Bausch & Lomb, Inc.*, 160 F. Supp. 2d 545, 550 (S.D.N.Y. 2001); *Lurzer GmbH v. American Showcase, Inc.*, 75 F. Supp. 2d 98, 102 (S.D.N.Y. 1998). These cases are no more relevant here than they were in the context of the legal adequacy of the termination notice, since Burnshire acquired no property interest as required by forfeiture law.

---

[10] Cliffs raises additional defenses, including that Burnshire's statement in the original complaint that the parties were "to close the sale on December 5, 2003" was a concession that the Closing Date was not November 14; that Cliffs did not waive its right to terminate the SPA by agreeing not to sell CAL to another party before December 5; that Burnshire was required to show evidence of financing, have completed a licensing agreement with Lurgi, and have obtained consents or waivers from third parties as described on Schedule 8.2(d) prior to closing and did not do so; and that a Closing Date cannot occur, under the terms of the agreement, without a closing. As the existence of multiple unfulfilled preconditions to closing is dispositive of the "Closing Date" issue, we do not consider these arguments in detail.

19

Moreover, relevant New York precedent holds that technical deficiencies in termination notice do not defeat the notice when the intended recipient received the notice and failed to object. *See, e.g., Dean v. Tappan Wire & Cable, Inc.*, No. 2001-1058, 2002 WL 2008229, at *1 (N.Y. App. Div. June 7, 2002); *Rower v. West Chamson Corp.*, 619 N.Y.S.2d 40, 40-41 (N.Y. App. Div. 1994) (citing *Caro v. City of New York*, 222 N.Y.S.2d 927 (N.Y. Sup. Ct. 1961)).

Here, Wuerth *requested* that the notice be sent to him at his attorney's office, received the transmission there, and failed to object to the adequacy of the notice until trial. As a result, though Burnshire is correct that it cannot be construed to have *waived* notice under the SPA without a writing to that effect, it is nonetheless estopped from raising the insufficiency of notice for the first time at trial. To allow Burnshire to prevail on such a technical issue would elevate form over substance; even in a case such as this one involving a technical contract, Wuerth's behavior in challenging the sufficiency of notice after personally directing Cliffs to send the termination notice to the attorney's office precludes finding that the resulting insufficient notice is dispositive. We therefore uphold the notice despite its technical deficiency.

Finally, Burnshire argues that Cliffs waived its right to terminate by requesting and receiving payment for several days after the notice of termination. Under New York law, waiver is a "voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1269-70 (N.Y. 1982); *see also Won's Cards, Inc. v. Samsondale/Haverstraw Equities, Ltd.*, 566 N.Y.S.2d 412, 416 (N.Y. App. Div. 1991). It cannot be "created by negligence, oversight, or thoughtlessness, and cannot be inferred from mere silence." *Peck v. Peck*, 649 N.Y.S.2d 22, 23 (N.Y. App. Div. 1996). Knowledge and intent may, however, be inferred from a party's actions, at least in landlord-

20

tenant law. *See South Park Assoc. v. Renzulli*, 94 F. Supp. 2d 460, 464 (S.D.N.Y. 2000) (holding that acceptance of a full month's rent waives notice of lease termination).

There is no indication from the evidence in this case that Cliffs intended to waive its termination right; to the contrary, the cover letter accompanying the invoice reaffirms that the SPA was "cancelled on November 26, 2003." Burnshire relies for this argument on deposition testimony by James Trethewey, a Cliffs employee, who stated that since Cliffs excluded potential buyers other than Burnshire from the CAL property until December 5, 2003, Burnshire should have paid carrying costs until that date. This evidence is conjectural and unrelated to the actual decision to bill Burnshire for the entire month, as Trethewey was in no way involved with the billing at issue. Further, Wuerth agreed to continue paying carrying costs after termination of the SPA without a contract while asset sale negotiations were ongoing, with the understanding that those payments would be refunded if no asset sale was completed.

Burnshire has raised no genuine issue of material fact as to the question of whether Cliffs's actions were sufficient to cancel the notice of termination. The letter attached to the invoice at issue explicitly declines to do so, and Wuerth understood that any overages would be refunded if the asset sale negotiations failed. Burnshire cannot argue that it reasonably relied on the continuation in force of the SPA after acknowledging that Cliffs had terminated the SPA. As a result, we find that Cliffs did not waive its termination by charging Burnshire for four days' worth of carrying costs after termination.

IV.

For the foregoing reasons, we **AFFIRM** both the district court's July 24, 2004 order dismissing Lurgi for lack of personal jurisdiction and its September 29, 2004 order granting Cliffs's

21

motion for summary judgment.